**Reina ALFARO, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 01–CM–394.**

District of Columbia Court of Appeals.

Argued May 20, 2004.

Decided Sept. 30, 2004.

Jonathan W. Anderson, Public Defender Service, with whom James Klein and Samia Fam, Public Defender Service, were on the brief, for appellant.

Keri S. Barta, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney at the time the brief was filed, and John R. Fisher, Thomas J. Tourish, Jr., and Deborah Conner, Assistant United States Attorneys, were on the brief, for appellee.

Before SCHWELB, REID,[*] and WASHINGTON, Associate Judges.

SCHWELB, Associate Judge:

Following a bench trial, Reina Alfaro was convicted of three counts of simple assault, in violation of D.C.Code § 22–504 (1996);[1] three counts of attempted second-degree cruelty to children, in violation of D.C.Code § 22–901(b) (1996);[2] and three counts of attempted possession of a prohibited weapon (APPW (b)) (telephone cord), in violation of D.C.Code § 22–3214(b) (1996).[3] The trial judge imposed concurrent sentences of imprisonment for 180 days on each count of simple assault; concurrent sentences of imprisonment for 180 days on each count of attempted second-degree cruelty to children, consecutive to all other sentences; and concurrent sentences of imprisonment for 180 days on each count of APPW (b), consecutive to all other sentences. The judge suspended ex-

ecution of each of the sentences, however, and Ms. Alfaro was placed on probation for two years.

On appeal, Ms. Alfaro does not challenge her convictions of attempted second-degree cruelty to children. She claims, however, that simple assault is a lesser included offense of attempted second-degree cruelty to children, and that her assault convictions therefore merge into her attempted cruelty convictions. Ms. Alfaro further contends that the evidence was insufficient to support her convictions of APPW (b).[4]

In conformity with our recent decision in *Bradley* and for additional reasons set forth below, we conclude that simple assault is not a lesser included offense of attempted second-degree cruelty to children, and we therefore affirm Ms. Alfaro's assault convictions. We further conclude, however, that the evidence of APPW (b) was insufficient to support her convictions of that offense.

## I.

### THE TRIAL COURT PROCEEDINGS

On February 6, 2000, three of Ms. Alfaro's sons—K.A., then twelve years of age; J.A., then eleven; and D.A., then ten—were whipped with a wet telephone cord while naked. The whipping was apparent-

---

[*] Judge Reid joins Parts II B and III of the opinion and agrees, for the reasons stated in *Bradley v. United States*, 856 A.2d 1157 (D.C. 2004) (per curiam), *pet. for reh'g or reh'g en banc pending*, that the offenses of assault and second-degree cruelty to children do not merge.

1. Recodified since the trial in D.C.Code § 22–404(a) (2001).

2. Recodified since the trial in D.C.Code § 22–1101 (2001).

3. Recodified since the trial in D.C.Code § 22–4514(b) (2001).

4. Ms. Alfaro also argues, in the alternative, that if the evidence was sufficient to establish her guilt of APPW (b), then, because her possession of the weapon during the relevant events was continuous, she violated the statute only once rather than three times. Because we conclude that the evidence was insufficient to convict Ms. Alfaro of APPW (b), we do not reach her alternative contention.

ly administered because the boys returned too late to their mother's home from a weekend visit to their father, from whom Ms. Alfaro was separated. The boys were then given a cold shower, which one of them described as "like freezing."

At trial the prosecution presented evidence which, if credited, showed that Ms. Alfaro was the person who beat the boys and ordered that they be given an icy shower. The defense claimed that Ms. Alfaro's oldest son (the victims' half-brother), M.L., aged sixteen, was the person who disciplined the youngsters. Indeed, M.L. testified that it was he who had beaten the boys with the cord, and he claimed that he had done so in order to punish them for being disrespectful to their mother.

During the weekend following the beatings, the victims' father noted their injuries and took his sons to the police. The boys were subsequently examined at Children's Hospital. There were loop-shaped markings, "reddish pink" in color, on various parts of the boys' bodies. These markings remained visible two weeks after the whipping took place.

At the conclusion of the trial, the judge resolved the credibility issues in favor of the prosecution.[5] He found Ms. Alfaro "guilty beyond a reasonable doubt of assaulting these three boys with a telephone wire while they were naked." Turning to the attempted second-degree cruelty charges, the judge found that "when you take it to a higher level, where you go ahead, wet the wire, make them go naked, and then force them to go take a cold, freezing shower after that beating, that is cruelty." Finally, with respect to the

APPW (b) charges, the judge found that "a telephone cord . . . is a wire wrapped with insulation," and that Ms. Alfaro wetted the cord and then used it to hit the children while they were naked, "with all due care [to make sure] that they were hurt." The judge ruled that, in these circumstances, the telephone cord "clearly would be considered" a dangerous weapon, and that Ms. Alfaro was guilty of APPW (b).[6]

## II.

## LEGAL ANALYSIS

### A. *Ms. Alfaro's claim of merger.*

Ms. Alfaro contends that every act of attempted second-degree cruelty to children is necessarily also an assault, that assault is a lesser included offense of attempted cruelty to children, and that her convictions of both attempted second-degree cruelty to children and assault, on the basis of the same conduct, subjected her to double jeopardy in violation of the Fifth Amendment. *See Brown v. United States,* 795 A.2d 56, 63 (D.C.2002) ("The Double Jeopardy Clause . . . prohibits multiple punishments for the same offense.") (Citations and internal quotation marks omitted.) Although counsel for Ms. Alfaro makes a spirited argument in support of this contention and presents a number of points not raised or addressed in *Bradley,* we do not agree with her claim, rejected in *Bradley,* that every act of attempted second-degree cruelty to children necessarily constitutes an assault. Specifically, we are of the opinion that an attempt to inflict mental or emotional pain or suffering upon a child, if sufficiently extreme or unreason-

---

**5.** The judge did not credit M.L.'s testimony that he beat the boys, finding that his description of what he did—*i.e.,* that he struck each boy once in the back—was contrary to the physical evidence of more extensive injuries.

**6.** In order to prove that the defendant committed the offense of APPW (b), the government must show that Ms. Alfaro possessed a "dangerous" weapon. See Part II B, *infra.*

able, constitutes attempted second-degree cruelty to children, but that such conduct is not simple assault. Accordingly, we conclude that assault contains an element that attempted second-degree cruelty to children does not, that the offenses do not merge, and that Ms. Alfaro's convictions of assault must therefore be affirmed.

### (1) *Pre-Bradley decisions.*

■ Prior to our decision in *Bradley*, the question whether simple assault merges into attempted second-degree cruelty to children was one of first impression in this jurisdiction. *Id.*, at 1160. The issue was raised, but not decided, in *York v. United States*, 803 A.2d 1009, 1012 (D.C.2002). The government points out that in *(Jonetta) Lee v. United States*, 831 A.2d 378, 379 (D.C.2003), this court affirmed convictions of simple assault and attempted cruelty to children which arose from the same conduct. As the government acknowledges, however, the issue presented by Ms. Alfaro in this case was not raised at all in *(Jonetta) Lee.* "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Murphy v. McCloud*, 650 A.2d 202, 205 (D.C.1994) (quoting *Webster v. Fall*, 266 U.S. 507, 511, 45 S.Ct. 148, 69 L.Ed. 411 (1925)). Because, in *(Jonetta) Lee*, "the judicial mind was not asked to focus upon, and the opinion did not address, the point at issue ... [the *(Jonetta) Lee* ] decision

lends no support to [the government's] position." *Hicks v. United States*, 658 A.2d 200, 202 (D.C.1995).[7]

■ Ms. Alfaro relies in substantial part on two cases not addressed in *Bradley*. She claims that *Beausoliel v. United States*, 71 App. D.C. 111, 107 F.2d 292 (1939), and *Carson v. United States*, 556 A.2d 1076 (D.C.1989), cases which she describes as binding on the court, support her claim that her convictions of assault and attempted cruelty to children merge. Neither of these decisions, however, is dispositive of the issue now before us. In *Beausoliel* the defendant, who had exposed himself to a child, was convicted of assault. He contended on appeal that the assault statute did not apply to his conduct, but the court affirmed his conviction, holding that the defendant's actions constituted common law assault. The defendant was not prosecuted for cruelty to children, and the District's cruelty to children statute was not at issue in the case. Nevertheless, the court stated by way of dictum that the predecessor of our present cruelty statute, "while not expressed in terms of assault, comes within the common law concept of that offense." *Beausoliel*, 107 F.2d at 296.[8]

In *Beausoliel*, no question regarding the cruelty to children statute was presented to the court. The court was not asked to decide, and the "judicial mind," *Murphy*, 650 A.2d at 205, certainly did not pass on, the question whether, when enacting the

---

7. The government also cites our observation in *Newby v. United States*, 797 A.2d 1233, 1240 (D.C.2002), that the attempted cruelty and simple assault statutes "may overlap in their application to some crimes against children, [but] the statutes are fully capable of coexisting." (Citation and internal quotation marks omitted.) In *Newby*, however, as in *(Jonetta) Lee*, the question whether the offenses merged was not raised by any party and was not decided by the court.

8. "Language in an opinion which 'constitutes obiter dictum, entirely unnecessary for the decision of the case ... [has] no effect as indicating the law of the District.'" *Albertie v. Louis & Alexander Corp.*, 646 A.2d 1001, 1005 (D.C.1994) (quoting *Noel v. Olds*, 78 U.S.App. D.C. 155, 160, 138 F.2d 581, 586 (1943), *cert. denied*, 321 U.S. 773, 64 S.Ct. 611, 88 L.Ed. 1067 (1944)).

cruelty to children statute, the legislature intended or did not intend to criminalize, *inter alia*, maltreatment which causes emotional rather than physical harm to a child. The court did not examine the language or structure of the statute, and *Beausoliel* therefore cannot reasonably be understood to have decided the issue here presented.

In *Carson*, this court stated that "D.C.Code § 22–901 is a codification of the common law crime of assault on children." 556 A.2d at 1078. But in that case, as in *Beausoliel*, the language relied on had no bearing on the outcome of the case, and the court was not presented with, nor did it decide, the question whether the cruelty to children statute prohibits non-assaultive maltreatment of a child. The court did not identify or attempt to construe the statutory language applicable to the issue now before us.

Even if the statements of the courts in *Beausoliel* and *Carson* connecting cruelty to children to common law assault could theoretically be read as suggesting, indirectly, that § 901(b)(1) proscribes only assaultive conduct and not mental cruelty, no such issue was before the court in either case. To suggest that these decisions mean what Ms. Alfaro says they mean takes each of them far beyond anything that the court could have contemplated in either case. Moreover, as we show below, the construction of the cruelty to children statute proposed by Ms. Alfaro is demonstrably contrary to its language and structure.[9]

(2) *Blockburger, Schmuck, and the identification of lesser included offenses.*

■ We must review "issue[s] regarding the merger of ... convictions *de novo*

... to determine whether there has been a violation of the Double Jeopardy Clause of the Fifth Amendment to the Constitution of the United States." *Maddox v. United States*, 745 A.2d 284, 294 (D.C.2000) (citation omitted); *Bradley*, at 1160. "The Double Jeopardy Clause ... prohibits 'multiple punishments for the same offense.'" *Brown v. United States*, 795 A.2d 56, 63 (D.C.2002) (citations omitted); *Bradley*, slip. op. at 3.

■ In *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932), the Supreme Court held that "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." In this jurisdiction, the *Blockburger* test "has been codified as an express declaration of legislative intent in D.C.Code § 23–112 (1989)." *Byrd v. United States*, 598 A.2d 386, 389 (D.C.1991) (en banc) (citing *Whalen v. United States*, 445 U.S. 684, 691–92, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980)); *Bradley*, at 1161. In applying the *Blockburger* test, the focus is on the "statutorily-specified elements of each offense and not the specific facts of a given case." *Byrd*, 598 A.2d at 389. This same "elements" test is employed when determining whether an offense is a lesser-included offense. *(David) Lee v. United States*, 668 A.2d 822, 825 (D.C.1995) (citations omitted).

■ An offense is a lesser-included offense if "the elements of the lesser offense are a subset of the elements of the charged

---

9. Even if assault were a lesser-included offense of second-degree cruelty to children, this would not necessarily mean that assault is also a lesser-included offense of *"attempted* second-degree cruelty to children." In light of our disposition, however, we do not reach this issue.

offense." *Schmuck v. United States,* 489 U.S. 705, 716, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989). In other words, to constitute a lesser-included offense, " 'the lesser [offense] must be such that it is impossible to commit the greater without first having committed the lesser.' " *Schmuck,* 489 U.S. at 719, 109 S.Ct. 1443 (quoting *Giles v. United States,* 144 F.2d 860, 861 (9th Cir.1944)). An analysis of the elements of simple assault and attempted second-degree cruelty to children reveals that the elements of the former are not contained within the elements of the latter, and that it is possible to commit attempted second-degree cruelty to children without committing simple assault. Thus, "[t]he two offenses do not merge because each requires an element of proof that the other does not." *Bradley,* at 1161.

(3) *Assault and attempted second-degree cruelty to children—a comparison.*

▉ The District's assault statute, D.C.Code § 22–504 (1996) (now § 22–404(a) (2001)), does not enumerate the elements of this offense. In the absence of a statutory definition, we have applied the common law of criminal assault. *See, e.g., Mungo v. United States,* 772 A.2d 240, 245 (D.C.2001). The essence of the common law offense of assault is the intentional infliction of bodily injury or the creation of fear thereof. "An assault has been defined by this court to be 'an attempt with force or violence to do a *corporal injury* to another . . . .' " *Beausoliel,* 107 F.2d at 296 n. 14 (emphasis added) (quoting *Patterson v. Pillans,* 43 App. D.C. 505, 506 (1915)). District of Columbia courts have recognized a number of different types of assault, including attempted battery, *id.;* intent to frighten assaults, *Williamson v. United States,* 445 A.2d 975, 978 (D.C. 1982); and offensive sexual touching, *Mungo,* 772 A.2d at 245. The elements of

the various types of assault are enumerated in CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 4.06 (4th ed.2002). All forms of assault share one common feature, namely, that they intrude upon bodily integrity and inflict bodily harm or the fear or threat thereof.

The statute proscribing attempted second-degree cruelty to children, on the other hand, is not necessarily limited to the protection of a child from bodily harm, or from the apprehension or threat of such harm. This conclusion is supported by the language and structure of the statute and by analogous judicial precedent. Section 22–901 (now recodified as § 22–1101 (2001)) provides in pertinent part as follows:

(a) A person commits the crime of cruelty to children in the first degree if that person intentionally, knowingly, or recklessly *tortures, beats, or otherwise willfully maltreats a child* under 18 years of age or engages in conduct which creates a grave risk of bodily injury to a child, and thereby causes bodily injury.

(b) A person commits the crime of cruelty to children in the second degree if that person intentionally, knowingly, or recklessly:

(1) *Maltreats a child* or *engages in conduct which causes a grave risk of bodily injury to a child;* or

(2) Exposes a child, or aids and abets in exposing a child in any highway, street, field house, outhouse or other place, with intent to abandon the child.

(Emphasis added.) Ms. Alfaro was charged with attempted second-degree cruelty, in violation of § 901(b)(1).

▉ "The primary rule of statutory construction is that the intent of the legislature is to be found in the language which

it has used," *J. Parreco & Son v. District of Columbia Rental Hous. Comm'n*, 567 A.2d 43, 46 (D.C.1989) (citing *United States v. Goldenberg*, 168 U.S. 95, 102–03, 18 S.Ct. 3, 42 L.Ed. 394 (1897)), and we therefore turn first to the statutory language. "[T]he words of the statute should be construed according to their ordinary sense and with the meaning commonly attributed to them." *Peoples Drug Stores, Inc. v. District of Columbia*, 470 A.2d 751, 753 (D.C.1983) (en banc) (quoting *Davis v. United States*, 397 A.2d 951, 956 (D.C. 1979)). We think that Ms. Alfaro's reading of the cruelty to children statute as a whole, and of § 901(b) in particular, as limited to assaultive conduct, is contrary to the foregoing principles of construction.

The word "cruelty" is not limited to the infliction of physical pain. "Cruel" means both "disposed to inflict pain" and "causing or conducive to injury, *grief* or pain." WEBSTER'S SEVENTH COLLEGIATE DICTIONARY 200 (1966) (hereinafter WEBSTER'S) (emphasis added). A divorce, for example, may be granted for "mental cruelty"; and "actual bodily harm or apprehension thereof need not be shown." *Waltenberg v. Waltenberg*, 54 App. D.C. 383, 385, 298 F. 842, 844 (1924).[10] The humiliation of another human being, reducing him or her to tears, is "cruel" in the commonly understood sense of the word. To lock a small child in a room in the dark for a week is cruel, though it does not constitute an assault. To limit "cruelty to children" to infliction of bodily harm, or to the inducement of fear of bodily harm, would accord the term an artificially restrictive meaning.

■ Similarly, the word "maltreat," which means "to treat cruelly or roughly," or to "abuse," WEBSTER'S at 512, cannot reasonably be read as embracing only physical maltreatment. *See Bradley*, at 1161. Section 22–901(a) provides that a person commits first degree cruelty to children if he or she "intentionally, knowingly or recklessly tortures, beats, *or otherwise willfully maltreats a child*." The use of the words "or otherwise" demonstrates that the statute applies not only to physical maltreatment such as torture or beating, but to other maltreatment as well. Further, an "abused" child, the synonym of a "maltreated" child, is defined in our neglect statute, *inter alia*, as one "whose parent ... inflicts, or fails to make reasonable efforts to prevent the infliction of, physical *or mental injury* upon the child." D.C.Code § 4.1301.02(1) (2001) (emphasis added); *see Bradley*, at 1161. To suggest that prolonged psychological torment of a child is not "maltreatment" is to distort the meaning of the term.[11]

---

10. The decision in *Waltenberg* contains a definition of cruelty in the divorce context which could reasonably be carried over, with relatively minor changes, to the context of cruelty to children:

> The conduct of one of the parties must at least be such as to render cohabitation intolerable to the other. And while actual bodily harm or apprehension thereof need not be shown, to justify granting a divorce on the ground of cruelty, yet there must have been such treatment as to destroy the peace of mind and happiness of the injured party, and to endanger the health or utterly defeat the legitimate objects of the marriage.

*Id.*

11. Ms. Alfaro argues in her response to the government's supplemental submission that "the court should not consider the definition of the word 'maltreatment' in its analysis because the government has waived the issue." Because the statute uses the term "maltreatment," the court is obviously obliged to construe it, and this obligation does not depend on the position taken by any party. Moreover, Ms. Alfaro has had the opportunity to respond to the government's argument on the point, so there is not the slightest possibility of unfairness. *See Watkins v. United States*, 846 A.2d 293, 295 (D.C.2004). In any event,

Further, an examination of the structure of § 901(b) reveals that sub-section (1) contains two distinct prohibitions which are separated from one another by the word "or." The first three words of § 901(b)(1) make it unlawful to maltreat a child, and this prohibition is unqualified by any requirement of bodily injury or of a risk of such injury. The statute then separately makes it unlawful to "engage[ ] in conduct which causes a grave risk of bodily injury to a child." As a matter of syntax, the words "grave risk of bodily injury" qualify "conduct," but do not apply to or limit the words "maltreats a child." The use of the word "or" establishes beyond peradventure that each of the two prohibitions in § 901(b)(1) stands on its own, and is independent of the other prohibition. *See also Bradley,* at 1161, discussing analogous language in § 901(a). The language and structure of the statute thus compel the conclusion that, although the second part (consisting of the last fourteen words) of § 901(b)(1) has to do with bodily injury, the prohibition against maltreatment is not so limited.

In *Nesbitt v. United States,* 205 A.2d 595 (D.C.1964), the defendant was charged with attempted cruelty to children by using children in an acrobatic performance.[12] The court held that the prosecution had not proved a violation of the statute be-cause, in the court's view, the evidence did not show that the performance created a danger to the children. *Id.* at 598. In reaching this conclusion, however, the court recognized that the purpose of the statute was the protection of children and that the legislation was enacted pursuant to the authority of the state, "acting as *parens patriae,* to protect 'the physical, mental or moral well-being of the child.'" *Id.* at 596 (quoting *State v. Ewer,* 141 N.Y. 129, 36 N.E. 4, 6 (1894)).

It is difficult to understand why Congress, in proscribing cruelty to and maltreatment of children, should be supposed to have excluded the deliberate and cruel infliction of serious mental or emotional suffering from the reach of a statute designed to protect children from, *inter alia,* mental or moral harm. In particular, it is unlikely that if such an exclusion had been intended, Congress would have left the words "maltreat a child" in § 901(b)(1) without any limitation by words restricting the term to bodily injury. Further, in *People v. Baxter,* 196 A.D. 824, 188 N.Y.S. 181 (App.Div.3d Dept.1921), the court stated that "[t]he infliction of physical *or mental pain or suffering* is the idea naturally conveyed to the mind by the use of the term [cruelty]." (Emphasis added.) We agree with the court in *Baxter.*

"not all legal arguments bearing upon the issue in question will always be identified by counsel, and we are not precluded from supplementing the contentions of counsel through our own deliberation and research." *Carducci v. Regan,* 230 U.S.App. D.C. 80, 86, 714 F.2d 171, 177 (1983) (Scalia, J.).

Ms. Alfaro cites numerous cases to the effect that beatings or physical assaults constitute maltreatment. These authorities do not mean, however, that *every* act of maltreatment must necessarily be a physical assault, a theory which (as we show in the text) is plainly not correct.

**12.** D.C.Code § 22–901 (1961), the cruelty to children statute under which the defendant in *Nesbitt* was prosecuted, made it unlawful, *inter alia,* to employ a child "as an acrobat, or a gymnast, or a contortionist, or a circus rider, or a rope-walker, or in any exhibition of like dangerous character." The statute went on to prohibit employment of a child as "a beggar, or mendicant, or pauper, or street singer, or street musician." Although § 901(b)(1), as it now reads, was not involved in *Nesbitt,* the provisions of the statute relating to activities such as begging were contrary to any notion that cruelty to children was limited to the intentional infliction of bodily injury or the fear or threat thereof.

■ Although there appears to be little other case authority addressing this specific issue, *see generally* Milton Roberts, Annotation, *Validity and Construction of Penal Statutes Prohibiting Child Abuse*, 1 A.L.R.4th 38 (1980 & Supp.2003), we have found no indication that the concept of cruelty to children is viewed by courts or legislatures as limited to bodily harm. *State v. Barr*, 354 So.2d 1344 (La.1978), is instructive. In that case, a mother intentionally left her two-year-old son in the middle of the 500 block of Bourbon Street in the French Quarter of New Orleans. The boy came to the attention of the police, and he was temporarily placed in foster care. The mother was charged with cruelty to a juvenile, in violation of a Louisiana statute which proscribed intentional or criminally negligent mistreatment "whereby unjustifiable pain or suffering is caused to said child." The Supreme Court of Louisiana reversed the mother's conviction, but expressly disclaimed any notion that only physical abuse violated the statute:

> "Unjustifiable pain and suffering" must be understood to mean something more than psychological harm resulting from the simple fact of separation of parent and child. The only evidence of pain and suffering in the record before us (and it is scant and speculative) shows rather minimal distress on the part of the child because of his mother's absence.
>
> Because of the lack of evidence of these necessary elements of the offense charged, we find error in the trial court's ruling on the motion to acquit. *However, we do not hold that abandonment cannot be "neglect;" nor do we hold that psychological harm cannot be "unjustifiable pain and suffering."*

*Id.* at 1347. The court's language suggests, and we agree, that the infliction of psychological harm can contravene a criminal statute prohibiting cruelty to children, but the harm must be serious and "unjustifiable" rather than mild or trivial.

In *Murray v. State*, 135 Ga.App. 264, 217 S.E.2d 293 (1975), the trial judge charged the jury, in a cruelty to children case, that a mother has the right to "reasonably chastise" a child for disobedience. The judge added, however, that "a mother's authorization shall in no way justify the infliction of cruel and excessive *physical or mental pain*." *Id.* at 295 (emphasis added). The appellate court held that the instruction was a "correct statement of the applicable law." *Id.* at 296. The result in *Murray* was undoubtedly foreordained, for the words of the instruction were taken directly from the Georgia statute. The District's statute, on the other hand, make no explicit reference to the infliction of excessive or unjustifiable mental pain. Nevertheless, the decision in *Murray* tends to confirm that legislatures and courts alike view the excessive infliction of psychological or emotional suffering as falling within the ambit of criminal proscriptions of cruelty to children. *See also People v. Curtiss*, 116 Cal.App.Supp. 771, 300 P. 801 (1931) (applying California statute making it a misdemeanor to "wilfully" inflict on any child "unjustifiable physical pain or *mental suffering*") (emphasis added); *Hunter v. State*, 172 Ind.App. 397, 360 N.E.2d 588, 594 (1977), *cert. denied*, 434 U.S. 906, 98 S.Ct. 306, 54 L.Ed.2d 193 (1977) (upholding constitutionality of Indiana statute prohibiting "any wilful act of omission or commission whereby unnecessary pain and suffering, *whether mental or physical*, is caused or permitted to be inflicted on a child") (emphasis added).

The parties have engaged in extensive debate as to whether or not particular acts of cruelty vis-a-vis children constitute criminal assaults. We find it unnecessary

to address the various scenarios that are the subjects of the competing contentions. If, as we conclude, the attempted second-degree cruelty to children statute, enacted *inter alia* to protect the mental and moral well-being of children, prohibits attempts to inflict unnecessary or unreasonable mental pain and suffering or psychological harm, then § 901(b)(1) can obviously be violated without the commission of an assault—an offense which, by definition, must actually or potentially impair the victim's *bodily* integrity. Accordingly, and notwithstanding the arguments presented by Ms. Alfaro but not discussed in *Bradley*, we adhere to the holding of that case and conclude that Ms. Alfaro's assault convictions do not merge into her attempted second-degree cruelty to children convictions. The assault convictions must therefore be affirmed.

B. *The sufficiency of the evidence of APPW (b).*

Ms. Alfaro contends that the evidence was insufficient as a matter of law to establish her guilt of any of the three counts of attempted possession of a prohibited weapon. Although her claim is premised on the notion that the telephone cord in this case was not a dangerous weapon—a notion that might strike an intelligent lay person as unrealistic—we are constrained by our precedents to agree with Ms. Alfaro.

In assessing a claim of evidentiary insufficiency, we must view the record "in the light most favorable to the government, giving full play to the right of the fact finder to determine credibility, weigh the evidence, and draw justifiable inferences of fact." *Perry v. United States*, 812 A.2d 924, 930 (D.C.2002) (citations omitted); *see generally Rivas v. United States*, 783 A.2d 125, 133–34 (D.C. 2001) (en banc). The court may "reverse a conviction for insufficient evidence only if there is no evidence from which a reasonable mind might find the defendant guilty beyond a reasonable doubt." *Williams v. United States*, 756 A.2d 380, 387 (D.C. 2000) (citations omitted).

To establish the offense of attempted possession of a prohibited weapon, the prosecution must show that Ms. Alfaro attempted to possess a dangerous weapon "with intent to use it unlawfully against another." D.C.Code § 22–3214(b) (1996), now recodified as § 22–4514(b) (2001). An object is a dangerous weapon if it is "known to be 'likely to produce death or great bodily injury' in the manner it is used, intended to be used, or threatened to be used." *Harper v. United States*, 811 A.2d 808, 810 (D.C.2002) (quoting *Williamson*, 445 A.2d at 979). While some items, such as knives, have been held to be inherently dangerous, "[a]n object which is not inherently dangerous can become dangerous by its use as a weapon." *Strong v. United States*, 581 A.2d 383, 386 (D.C. 1990) (citation omitted). Whether something is a dangerous weapon, *i.e.*, whether it is likely, as used, to produce the requisite injury, "is ordinarily a question of fact to be determined by all the circumstances surrounding the assault," and the analysis may be based on "familiar and common experience." *Williamson*, 445 A.2d at 979 (citation omitted). Thus, an ordinary object may become a dangerous weapon when it is used to injure another person. *See, e.g., (Carl) Jones v. United States*, 401 A.2d 473, 476 (D.C.1979) (furniture leg used to inflict a beating); *United States v. Brooks*, 330 A.2d 245, 246–47 (D.C.1974) (wooden table leg thrown at the victim).

In the present case, the judge found that Ms. Alfaro used a telephone cord—a wire wrapped in insulation—on the naked skin of her three young sons in a manner to ensure that they would be hurt. The testi-

mony of the boys established that the whipping was painful, and the looped marks of the whipping were evident on their bodies two weeks after the fact. Under the circumstances, the trial judge's conclusion that the telephone wire was a dangerous weapon cannot fairly be characterized as unreasonable. Nevertheless, the result reached by the judge cannot be reconciled with our case law.

■ As we have noted above, a weapon is dangerous if it is "known to be 'likely to produce death or great bodily injury'" in the manner in which it is used. *Harper,* 811 A.2d at 810 (quoting *Williamson,* 445 A.2d at 979). When the object used (like the telephone cord in this case) is not a dangerous weapon *per se,* the prosecution must prove that the object "is one which is *likely* to produce death or great bodily injury by the use made of it." *Scott v. United States,* 243 A.2d 54, 56 (D.C.1968) (emphasis in original). Although "great bodily injury" has not been defined in this jurisdiction by statute, it is difficult to distinguish the term from "serious bodily injury." Indeed, we find it impossible, as a practical matter, to envisage a bodily injury that is "great" but not "serious." *See Arthur v. United States,* 602 A.2d 174, 177 (D.C.1992) (apparently using the two terms interchangeably).

The term "serious bodily injury" has been defined as "bodily injury that involves a substantial risk of death, unconsciousness, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental facility." D.C.Code § 22–3001 (1981) (repealed). In recent years, we have applied this definition to the term

"serious bodily injury" in prosecutions for aggravated assault. *Nixon v. United States,* 730 A.2d 145, 150 (D.C.1999); *see also Gathy v. United States,* 754 A.2d 912, 917–19 (D.C.2000). Elsewhere in the District of Columbia Code, "serious bodily injury" is defined as "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." D.C.Code § 2–1542(11) (2001). There was no evidence presented in this case from which a trier of fact could reasonably find that the telephone cord, even when used as it was to administer vicious whippings to naked children, created a substantial risk of death, unconsciousness, or the kind of "extreme" pain that can reasonably be compared to or equated with any of the categories of serious injury enumerated by the legislature and adopted by this court in *Nixon.*[13]

Moreover, even if we were to assume, illogically, that "great" bodily injury means something less than "serious" bodily injury, the evidence in this case does not rise to the level of "great" bodily injury as that term is commonly understood. The New Mexico legislature has defined "great bodily harm" as "an injury to the person which creates a high probability of death; or which causes serious disfigurement; or which results in permanent or protracted loss or impairment of the function of any member or organ of the body." N.M. STAT. ANN. § 30–1–12(A) (2003). A Wisconsin statute defines "great bodily harm" as "bodily injury which creates a substantial risk of death, or which causes serious or permanent disfigurement, or which causes a permanent or protracted loss or

---

**13.** Although there was testimony that at least one of the boys cried because the whipping hurt, the government has not drawn our attention to any evidence that the pain was extreme or unbearable. The boys apparently went to bed following the whipping and then pursued their normal lives.

impairment of the function of any bodily member or organ or other serious bodily injury." WIS. STAT. § 939–22(14) (2002). According to the Supreme Court of Indiana, "great bodily harm" means "great as distinguished from slight, trivial, minor or moderate harm, and as such does not include mere bruises ...." *Froedge v. State*, 249 Ind. 438, 233 N.E.2d 631 (1968); *see also McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1239 n. 5 (11th Cir.2003) (using same definition of "great bodily harm"). Arguably, the victims' injuries in this case were not "mere bruises," but in our view, they cannot reasonably be characterized as falling within the usual definition of *great* bodily injury, nor were they comparable to the illustrative examples enumerated in the legislation we have cited. Accordingly, having reviewed the evidence in the light most favorable to the government, we conclude that the prosecution failed to prove that the telephone cord was "likely," when used as Ms. Alfaro used it, to inflict "great" or "serious" bodily injury. The cord therefore was not a dangerous weapon within the meaning of the APPW (b) statute, and we cannot sustain Ms. Alfaro's convictions of APPW (b).

## III.

## CONCLUSION

For the foregoing reasons, Ms. Alfaro's convictions of simple assault and of attempted second-degree cruelty to children are affirmed. Her convictions of attempted possession of a prohibited weapon are reversed. The case is remanded to the trial court with directions to enter a judgment of acquittal with respect to each of the three APPW (b) counts.

*So ordered.*