*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

No. 23-CM-0782

DEJA AKERS, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2023-DVM-000405)

(Hon. Jennifer Anderson, Trial Judge)

(Argued June 4, 2024                                    Decided May 28, 2026)

*Russell A. Bikoff* for appellant.

*Ari B. Rubin*, Assistant United States Attorney, with whom *Matthew M. Graves*, United States Attorney at the time the brief was filed, and *Chrisellen R. Kolb* and *Alexis Dunlap*, Assistant United States Attorneys, were on the brief, for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and BECKWITH and SHANKER, *Associate Judges*.

BECKWITH, *Associate Judge*: Appellant Deja Akers appeals her conviction for attempted second-degree cruelty to children stemming from an incident in which Ms. Akers yelled at her five-year-old son and struck him with a lanyard after receiving a phone call reporting that he had misbehaved at school. *See* D.C. Code

§§ 22-1101(b)(1) and -1803. Ms. Akers argues (1) that the evidence was insufficient to support her conviction, and (2) that even if there was sufficient evidence to support her conviction, the parental discipline defense applies. We hold that the government presented insufficient evidence of the charged offense and therefore vacate Ms. Akers's conviction.

## I.

At Ms. Akers's bench trial, the government presented the following evidence regarding an interaction that took place between Ms. Akers and her son, T.A., at their home. T.A.'s father, Antonio Avery—who lived elsewhere and had partial custody of T.A.—testified that the incident occurred when he was dropping T.A. off at Ms. Akers's apartment. As Mr. Avery entered the apartment with T.A., Ms. Akers told Mr. Avery that she was going to discipline T.A. for misbehaving at school. According to Mr. Avery, Ms. Akers began to "repeatedly" hit T.A.'s legs with a lanyard, prompting Mr. Avery to start filming Ms. Akers's conduct with his phone because he thought it was excessive.

On the video, which the government introduced at trial, Ms. Akers can be heard dressing down T.A. while Mr. Avery films from down the hall. The footage captures Ms. Akers yelling at T.A. for roughly two and a half minutes while he cries. She repeatedly tells T.A. "to shut the fuck up" and "stand [his] ass up," all while

referring to his poor conduct at school. Something that sounds like an object striking another is audible in the background, but the source of that sound is not apparent from the footage. Shortly after he starts filming, Mr. Avery enters the room, and Ms. Akers can be seen on the video with a lanyard in her hand. Ms. Akers tells T.A.: "don't you ever let me hear in your motherfucking life . . . that your ass couldn't sit the fuck down . . . don't let your teacher call my motherfucking phone." When Ms. Akers then sends T.A. to do his homework, Mr. Avery says to T.A., "when you wake up in the morning . . . ," at which point Ms. Akers quietly finishes the sentence: "you're getting your ass whupped again." Mr. Avery then tells Ms. Akers not to hit T.A. anymore "because I don't want him to have physical damage." To that, Ms. Akers responds that "he ain't going to have no physical damage, he's going to have a severe mental one."[1]

In closing argument, the prosecutor focused on Ms. Akers's "berating" of T.A., arguing that "[c]ruelty to children . . . encompasses mental and physical harm" and that Ms. Akers's statements would "have a profound and lasting impact on [T.A.'s] mental well-being." The prosecutor made only a passing reference to allegations that Ms. Akers hit T.A. with a lanyard. When the defense argued in

---

[1] The government and defense called several other witnesses, but they testified primarily about an incident of which Ms. Akers was acquitted. Ms. Akers did not testify.

closing that the video did not show any strikes with a lanyard, the trial judge interrupted to ask whether the government was even relying on this physical conduct as she "didn't really hear [the prosecutor] argue . . . about the hitting of the legs with the lanyard." The prosecutor responded that in the government's view, the evidence showed that Ms. Akers hit T.A. with the lanyard, but this contact did not "rise[] to the level of . . . grave risk of bodily harm," and the government's theory instead focused on "maltreatment," which involved nonphysical cruelty, "not grave risk of bodily injury based on the hitting." The trial court characterized the government as arguing that "the way [Ms. Akers] spoke to [T.A.]" was maltreatment.

Prior to issuing its verdict, the trial court noted that "there's . . . not a lot of dispute about what happened here, because . . . there's a tape recording" in which "[y]ou can hear" the interaction between Ms. Akers and her son on the video, though "you can't actually see it." Based on the footage, the trial court found that Ms. Akers hit T.A. with the lanyard but that it was unclear whether she hit him with the key or the cloth part of the lanyard. The trial court also found that Ms. Akers talked to T.A. "basically in a way that you would not even talk to a dog . . . just constantly berating the child" while T.A. was "hysterical."

In determining whether the conduct on display in the video amounted to child cruelty, the trial court described the government as "relying . . . [on] a combination

of things"—that is, "she disciplined the child, and then in the midst of disciplining the child, she curses at the child." The court further stated that "the government is not relying on the hitting with the lanyard" and that "they're right not to rely on it because . . . that would be considered parental discipline." *See Florence v. United States*, 906 A.2d 889, 893 (D.C. 2006) ("A defendant charged with . . . cruelty to children may claim the privilege of parental discipline. The defense is established where the defendant uses reasonable force for the purpose of exercising parental discipline." (internal citation omitted)).

In the view of the trial court, Ms. Akers's verbal conduct rose to the level of maltreatment under the child cruelty statute. At the outset, the court noted that "you have to take into account [T.A.'s] age. He's only five." Given T.A.'s young age, the court found that the language used by Ms. Akers was "incredibly excessive." According to the court, two comments Ms. Akers made exacerbated the impact of her yelling at T.A. First, her comment to Mr. Avery that T.A. would have "severe mental damage" rather than physical injuries indicated that her intent was to cause him psychic pain and that she was aware she was causing him such pain. And second, Ms. Akers's comment that T.A. would "get his ass whupped again" the next morning "would leave a little child, like, five, in terror." The court concluded that "this level of verbal abuse rises to the level of maltreatment" and that it was not justified as

parental discipline because it was excessive.[2]

## II.

Although Ms. Akers makes two distinct arguments on appeal—(1) that the evidence was insufficient to support her conviction, and (2) that even if there were sufficient evidence to support her conviction, the parental discipline defense would apply—these arguments are not entirely separate because conduct is not "maltreatment" if it is reasonable parental discipline. Moreover, once a defendant fairly raises reasonable parental discipline as an affirmative defense, the government must disprove it beyond a reasonable doubt, just like a statutory element. *See, e.g.,* *Powell v. United States*, 916 A.2d 890, 894 (D.C. 2006) (quoting *Lee v. United States*, 831 A.2d 378, 380 (D.C. 2003)). Here, the government appears to concede that Ms. Akers fairly raised the issue of reasonable parental discipline, even though it argues that the issue was sufficiently rebutted. Thus, in determining the legal sufficiency of the government's proof of "maltreatment," we likewise take into account the defendant's ostensible disciplinary purpose and the conduct's relationship to that purpose.

---

[2] The trial court acquitted Ms. Akers of a second count of attempted child cruelty involving a separate incident later that month.

In evaluating sufficiency-of-the-evidence claims, we view the evidence in the light most favorable to the prosecution in determining whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). This standard is deferential to the factfinder's right to weigh the evidence, judge witnesses' credibility, and "draw all justifiable inferences of fact." *In re L.L.*, 974 A.2d 859, 866 (D.C. 2009) (quoting *Earle v. United States*, 612 A.2d 1258, 1265 (D.C. 1992)). But it is not "toothless," and we "have an obligation to take seriously the requirement that the evidence in a criminal prosecution must be strong enough that a [factfinder] behaving rationally really could find it persuasive beyond a reasonable doubt." *Rivas v. United States*, 783 A.2d 125, 134 (D.C. 2001) (en banc). Although Ms. Akers raises a sufficiency claim, "[a]t bottom, we are called upon to determine the reach of the statute" prohibiting child cruelty. *Wynn v. United States*, 48 A.3d 181, 188 (D.C. 2012). "We review sufficiency of the evidence and embedded statutory interpretation issues de novo." *Robinson v. United States*, 263 A.3d 139, 141 (D.C. 2021).

D.C. Code § 22-1101(b)(1) establishes that "[a] person commits the crime of cruelty to children in the second degree if that person intentionally, knowingly, or recklessly . . . [m]altreats a child or engages in conduct which causes grave risk of bodily injury to a child." In *Alfaro v. United States*, we held that this statutory

language "contains two distinct prohibitions": the first against maltreatment, which "is unqualified by any requirement of bodily injury or of a risk of such injury," and the second against conduct that "causes a grave risk of bodily injury." 859 A.2d 149, 158 (D.C. 2004).

The government's theory of prosecution in this case rested on the former—an allegation of nonphysical "maltreatment." The questions before us are thus what type of nonphysical "maltreatment" rises to the level of criminal conduct under D.C. Code § 22-1101(b)(1), and, in turn, whether Ms. Akers's conduct here meets that standard.

Although the child cruelty at issue in *Alfaro* involved a physical assault, for purposes of deciding whether a second-degree[3] attempted-cruelty-to-children conviction merged with an assault conviction for double jeopardy purposes, the court had to determine whether child cruelty under § 22-1101(b)(1) could ever be nonphysical. *Id.* at 157-60. The court concluded that it would give the statute's "cruelty to children" label "an artificially restrictive meaning" if it were limited "to infliction of bodily harm, or to the inducement of fear of bodily harm." *Id.* at 157.

---

[3] An individual who "maltreats" a child is guilty of first-degree (rather than second-degree) cruelty to children when the maltreatment is "willful." D.C. Code §§ 22-1101(a), (b)(1).

While *Alfaro* did not precisely state a standard for how serious nonphysical conduct must be to constitute "maltreatment," the court did offer in dicta a few examples, and descriptive language, of what may or may not qualify. Reasoning that the exclusion of "prolonged psychological torment of a child" from the category of behavior that amounts to "maltreatment" would "distort the meaning of the term," the court assumed that, for example, "lock[ing] a small child in a room in the dark for a week" could rise to the level of "child cruelty" even if not "an assault." *Id.* at 157. In the court's view, maltreatment could include "deliberate and cruel infliction of serious mental or emotional suffering" as well as "excessive infliction of psychological or emotional suffering," even in the absence of physical abuse. *Id.* at 157-60.

On the other hand, the *Alfaro* court noted that not all mental distress caused by a guardian's conduct amounts to "maltreatment." The court cited with approval *State v. Barr*, where the Louisiana Supreme Court concluded that the government had failed to establish that a mother had caused her two-year-old child "unjustifiable pain or suffering" when she intentionally left him in the middle of Bourbon Street in the French Quarter, where he was eventually picked up by police and temporarily placed in foster care. 354 So.2d 1344, 1347 (La. 1978). According to the court in *Barr*, the government had to demonstrate more than the "psychological harm resulting from the simple fact of separation of parent and child." *Id.* The *Alfaro* court

agreed with the Louisiana court's suggestion "that the infliction of psychological harm can contravene a criminal statute prohibiting cruelty to children, but the harm must be serious and 'unjustifiable' rather than mild and trivial." *Alfaro*, 859 A.2d at 159; *see also id.* at 159 (discussing a Georgia appellate court decision that upheld a trial court's instruction that a mother had the right to "reasonably chastise" a child for disobedience as long as that chastisement did not inflict cruel and excessive physical or mental pain) (citing *Murray v. State*, 217 S.E.2d 293, 295 (Ga. Ct. App. 1975)).

In these respects, the District's child cruelty statute mirrors the parental-use-of-force statute of the Model Penal Code, which also explicitly includes as unjustified the infliction of nonphysical as well as physical suffering on children but limits a parent or guardian's criminal liability to conduct that is "designed to cause or known to create a substantial risk of causing" "extreme" pain or "extreme" mental distress. Model Penal Code § 3.08(1)(b) (Am. Law. Inst. 1962); *see also id.* § 3.08(7)(b). Yet just as the legislative history of § 22-1101(b)(1) is silent on exactly what constitutes criminal emotional or mental "maltreatment," the Model Penal Code's commentaries do not say exactly what constitutes "extreme" mental distress. *See* § 3.08, Model Penal Code and Commentaries 138-46 (1985).

At least one state court, however, has thoughtfully addressed what constitutes "extreme mental distress" as compared to mental distress that is not extreme. In *State v. Dowling*, the Hawaii Court of Appeals reversed the child abuse conviction of a man accused of mental or emotional maltreatment of a minor where he was angry with his wife's son for lying about having caused a rug to stick under a closet door. 263 P.3d 116, 118, 123 (Haw. App. 2011). Specifically, the man pushed the minor on the shoulder and punched him twice on the leg with a closed fist while he "was in a fetal position"—all causing the minor to be scared, to cry out, and to still have the incident on his mind a week later when he reported it to his great-grandmother. *Id.* at 118. In concluding that this conduct, while disquieting, was noncriminal, the court turned to *Black's Law Dictionary* to explain the difference between mental suffering and extreme mental suffering caused by parental discipline:

> Emotional distress passes under various names, such as mental suffering, mental anguish, mental or nervous shock, or the like. It includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea. It is only where it is extreme that the liability arises. Complete emotional tranquility is seldom attainable in this world, and some degree of transient and trivial emotional distress is a part of the price of living among people. The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it. The intensity and the duration of the distress are factors to be considered in determining its severity. Severe distress must be proved; but in many cases the extreme and

> outrageous character of the defendant's conduct is in itself important evidence that the distress has existed.

*Id.* at 122 (internal citations omitted).

These persuasive authorities, along with the illustrative dicta in *Alfaro*, signify that while evidence of extreme verbal abuse may be sufficient to prove child cruelty under the statute's maltreatment clause, mere harsh statements or the infliction of some degree of emotional or mental distress is not enough to justify a criminal conviction. This is a sensible take. Absent a high bar for what constitutes emotional or mental maltreatment, our statute would allow parents to physically discipline but not to sharply verbally chastise their children. *See Florence*, 906 A.2d at 894 ("This is not a jurisdiction where physical discipline of children is outlawed.").

Instead, we glean from these cases that the intentional, knowing, or reckless infliction of emotional or mental distress on a child constitutes "maltreatment" only where that distress is serious and extreme. We do not suggest that the distress must be of a particular duration; one could imagine the brief but horrifying mental torture of a child, unrelated to any reasonable disciplinary purpose, such as falsely reporting the murder or suicide of a parent while claiming it was the child's fault or exposing the child to extreme violence against a loved one. On the other hand, disciplinary punishment that might not be per se extreme if fleeting or unrepeated, such as briefly locking a physically out-of-control child in a closet, might constitute extreme mental

distress if it continues at length. Ultimately, both the "intensity and duration" of the distress are factors to be considered by a trial court in determining whether the distress is extreme. *Dowling*, 263 P.3d at 122.

The government's burden to prove serious and extreme mental distress as part of proving "maltreatment" is in addition to, and separate from, the statute's mens rea requirement. Under § 22-1101(b)(1), the defendant must act at least recklessly with respect to the infliction of maltreatment, meaning that the defendant must at least have been consciously aware of a substantial risk that the child would experience serious or extreme mental distress. *See Jones v. United States*, 813 A.2d 220, 225 (D.C. 2002) (stating that an instruction to the jury that a defendant acted "recklessly" if he "was aware of and disregarded the grave risk of bodily harm created by his conduct" was "consistent with the usual meaning of that term"). Conversely, the fact that a defendant acts recklessly, knowingly, or even intentionally in inflicting emotional distress on a child does not render her guilty of child cruelty if the act requirement is not met—that is, if the suffering does not rise to the level of "maltreatment" or extreme emotional or mental distress. *See, e.g.*, *Alfaro*, 859 A.2d at 158 (noting that "deliberate and cruel infliction of serious mental or emotional suffering" could be maltreatment and implicitly recognizing that proving the defendant's mental state is in addition to the requirement that the suffering be "serious").

Applying these principles to this case, we conclude that Ms. Akers's "berating" of T.A.—while undeniably problematic caretaker behavior—is insufficient to meet the high bar of criminal "maltreatment." First, the context of the interaction was the child's reported and repeated misbehavior at school, which objectively indicated to a child of school age that the actions taken were related to discipline. We note this not to suggest that Ms. Akers's subjective purpose was solely disciplinary, but to suggest that a child may be less seriously affected by an interaction associated with a temporary school disciplinary issue than by an unexpected and unexplained parental outburst.[4] Second, the verbal statements, while undeniably harsh, crude, and belittling, lasted only a few minutes and were not

---

[4] Relatedly, that Ms. Akers hit T.A. with a lanyard while "berating" him—while relevant—did not push her conduct over the line of maltreatment. The trial court did not rely on the physical hitting, and the record supports the court's conclusion that the strikes with the lanyard fell within the scope of the parental discipline defense. *See, e.g.*, *Florence*, 906 A.2d at 895-96 (holding that the parental discipline defense applied to mother hitting daughter on the leg with curling iron in response to a legitimate disciplinary concern); *Longus v. United States*, 935 A.2d 1108, 1112 (D.C. 2007) (holding that the parental discipline defense applied to father slapping the back of his daughter's head). In the circumstances of this case, Ms. Akers's physical disciplining of T.A. did not constitute maltreatment, either alone or in conjunction with the distress caused by Ms. Akers's verbal statements. *Cf. Speaks v. United States*, 959 A.2d 712, 717 (D.C. 2008) (noting, in addressing a sentencing issue, that the evidence was sufficient to convict appellant of child cruelty where two-year-old twins sustained a battery unrelated to discipline in addition to "emotional pain and suffering" when they were in the back seat of a carjacked vehicle that sped away and eventually crashed into another car, deploying the airbags in their vehicle and totaling the other car).

tantamount to "prolonged psychological torment." *See Alfaro*, 859 A.2d at 157.

And finally, while some actions can constitute maltreatment even if they are not prolonged, the actions here are not of the type to inflict extreme mental distress in short order. The trial court placed great emphasis on Ms. Akers's statement that T.A. "would get his ass whupped again" the next day and on her murmured comment, in response to Mr. Avery's warning against inflicting "physical damage" on T.A., that she would inflict "severe mental damage." As for the first statement, although telling a child that he will get his "ass whupped" is objectively likely to cause some emotional distress, we cannot fairly conclude that such an off-the-cuff warning of additional discipline rises to the level of extreme emotional torment justifying criminal liability. A reasonable juror could not reasonably infer that any distress Ms. Akers's statements caused T.A. was serious and extreme. The "severe mental damage" statement, on the other hand, was directed toward the child's father rather than at T.A. himself, and the court accordingly viewed it as evidence of Ms. Aker's intent. Even if this seeming reflexive wordplay was sufficient to establish Ms. Akers's intent (or mens rea)—a question we need not decide—mens rea is only one element of the cruelty-to-children charge. Where, like here, the act requirement is not satisfied, the government has not met its burden.

**III.**

For the foregoing reasons, we conclude that Ms. Akers's actions—two minutes of harsh verbal scolding followed by two minutes of intermittent comments about T.A.'s misbehavior and corresponding punishment—fall outside the scope of the child cruelty statute. Ms. Akers's conviction for child cruelty is thus not supported by sufficient evidence, and we reverse the judgment of the Superior Court.

*So ordered.*