**Morris ARTHUR, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 90–381.

District of Columbia Court of Appeals.

Argued Nov. 13, 1991.
Decided Jan. 17, 1992.

Richard C. Goemann, appointed by this court, for appellant.

1. D.C.Code §§ 22–501, 22–3202 (1989).

2. D.C.Code § 22–504 (1989).

David L. Smith, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher, Thomas J. Tourish, Jr., and Heidi M. Pasichow, Asst. U.S. Attys., were on the brief, for appellee.

Before TERRY, FARRELL and KING, Associate Judges.

TERRY, Associate Judge:

Appellant Arthur was convicted of assault on Kathleen DeGrace with intent to kill her while armed with a dangerous weapon, namely, a shod foot,[1] and of simple assault[2] on her son, Jeremi DeGrace. On this appeal he challenges only the sufficiency of the evidence to sustain the conviction of assault with intent to kill while armed, for which he received a sentence of seven to thirty years in prison. We affirm.[3]

## I

In August 1989 Kathleen DeGrace was living with three of her five children in Room 377 of the Capital City Inn, which until its recent demolition was leased by the District of Columbia government to house homeless families. Appellant Arthur, with whom she had previously lived and who was the father of two of her children, resided in another room. On August 11 Arthur received a paycheck, and shortly after 6:00 p.m. he went to Room 377 with the intention of taking his daughter Deanna shopping. However, when Ms. DeGrace told him that Deanna was ill and should not leave the room, Arthur decided to stay and play with Deanna, who was then seven months old.

Arthur remained in Room 377 for dinner with Ms. DeGrace, her sons Christopher (five) and Jeremi (ten), and the baby Deanna. When dinner was over, Jeremi went outside to play, and Arthur went out to purchase some liquor. After both of them returned, Jeremi went to sleep in a bed

3. In another count of the same indictment, Arthur was also charged with assaulting Kathleen DeGrace on a different date with intent to kill her. He pleaded guilty under that count to the lesser included offense of simple assault.

alongside his younger brother and sister, and Arthur, after playing with the baby for a while, fell asleep in a chair.

Some time later Arthur awoke to discover Ms. DeGrace going through his pockets. Fearing that she was stealing his money to buy drugs, he arose in anger, grabbed Ms. DeGrace, and threw her to the floor. This awakened the children, who began screaming and crying. Then, after she told Jeremi to "call security," Arthur began stomping repeatedly on Ms. De-Grace's head. Arthur was wearing white sneakers as he stomped, and he admitted at trial that he used "a lot of pressure" in the stomping.

After a few moments Arthur stopped assaulting Ms. DeGrace and turned to leave, saying, "I hope she's dead. I hope she's dead." When she started "breathing real hard," however, he exclaimed, "She ain't dead," and went back over to where she lay on the floor. Arthur tried to step on her again, but because Jeremi was kneeling beside her, trying to pick her up, Arthur stepped instead on the back of Jeremi's head. Jeremi, weeping and angry "because he had no right to step on my mother," moved back out of the way, and Arthur resumed his abuse of Ms. DeGrace.

As the stomping continued, thirteen-year-old Sean Williams heard noises coming from Room 377 and went to investigate. When he looked inside the room through the partially open door, he saw Kathleen DeGrace lying on the floor, next to the bed, and Arthur "over top of [her], stomping on her face ... going up and down with his foot, stomping." Blood was coming from the side of Ms. DeGrace's mouth. Jeremi and Deanna were also in the room, and both of them were crying. Arthur apparently saw Williams watching, went and closed the door, and returned to his assault on Ms. DeGrace. Williams, in the meantime, notified others at the Capital City Inn of the assault in progress and asked a woman in another room to call the security guard.

When Arthur finally ceased his attack on Ms. DeGrace, he left Room 377 and went to the security desk in the front lobby of the Capital City Inn. There he was met by Cornell Chappelle, a Department of Human Services social worker assigned to the shelter. In an office adjacent to the security desk, Arthur said to Chappelle, "I just stomped my old lady." Almost immediately a group of residents burst into the office and tried to attack Arthur, but Chappelle and a security guard "managed to get most of the folks off of him and out of the office." The police arrived shortly and placed Arthur under arrest.

Meanwhile, an ambulance was summoned, and when it arrived, the paramedics found Ms. DeGrace unconscious, her face bloody and extremely swollen. After assessing the extent of her injuries, they took her to the MedStar shock-trauma facility at the Washington Hospital Center. There she was met by a team of trauma specialists led by Dr. Grace Rozycki. The doctor testified that Ms. DeGrace's injuries were "severe," "critical," and "immediately life-threatening." [4] Ms. DeGrace was later transferred to the intensive care unit of the hospital, where she was further diagnosed as suffering from "severe blunt trauma."

After a few days Ms. DeGrace was moved to a step-down unit at the Washington Hospital Center, and several weeks later she was taken to the National Rehabilitation Hospital. There she began rehabilitative therapy with Dr. Warren Lux, director of the hospital's brain injury rehabilitation program. Dr. Lux testified that when Ms. DeGrace first came to the Rehabilitation Hospital, she had trouble walking, getting out of bed, going to the bathroom, and taking care of her basic day-to-day needs. Although she made some progress, Dr. Lux concluded that Ms. De-Grace continued to have "difficulty with some of the higher level kinds of thinking." He opined that Ms. DeGrace would never

---

4. Dr. Rozycki described MedStar as "a receiving facility for ... severely injured trauma patients.... [W]hat distinguishes it from an emergency room is specifically the severity of the patient's injuries, and also the fact that we as a trauma team are waiting for the patient, ready to resuscitate that patient instantly. The patient doesn't have to wait for us."

fully recover from the traumatic head injuries she had received.

The government's final witness was Kathleen DeGrace. She had no memory at all of her encounter with Morris Arthur. She testified, however, that her health had changed: "I can't walk. I can't get dressed. I can't get my children dressed. My left side is slow, and my voice is slow, and I can't—I have no memory, hardly any memory." When asked whether she could previously "do all the things that you say you can't do now," she answered, "Yes."

## II

Arthur contends that the government failed to introduce sufficient evidence of the dangerous character of the shoes he wore while perpetrating the assault on Kathleen DeGrace. In order to convict someone of assault with intent to kill while armed, the government must prove *inter alia* that the defendant, at the time of the assault, was "armed with or [had] readily available any ... dangerous or deadly weapon...." D.C.Code § 22–3202(a) (1989). We must, of course, view the evidence in the light most favorable to the government, keeping in mind the right of the jury to assess credibility and to draw reasonable inferences from the evidence it has heard. *United States v. Hubbard*, 429 A.2d 1334, 1337–1338 (D.C.) (citing cases), *cert. denied*, 454 U.S. 857, 102 S.Ct. 308, 70 L.Ed.2d 153 (1981); *Byrd v. United States*, 388 A.2d 1225, 1229 (D.C.1978) (citing cases). Moreover, we recognize no legal distinction between direct and circumstantial evidence. *Franey v. United States*, 382 A.2d 1019, 1023 (D.C.1978) (citing cases); *see Holland v. United States*, 348 U.S. 121, 140, 75 S.Ct. 127, 137, 99 L.Ed. 150 (1954). Applying these principles, we hold that there was ample evidence that Arthur's shoe was a dangerous weapon.

Arthur does not dispute that a shod foot can be a dangerous weapon if it is used in such a way as to cause death or great bodily injury. Indeed, he cannot, for it has been the law in the District of Columbia for almost forty years that "shoes on feet" are dangerous weapons, "at least when they inflict serious injuries." *Medlin v. United States*, 93 U.S.App.D.C. 64, 65, 207 F.2d 33, 33 (1953) (citation omitted), *cert. denied*, 347 U.S. 905, 74 S.Ct. 431, 98 L.Ed. 1064 (1954). He claims instead that the government failed to establish that the shoes he wore during the assault caused any injury more significant than would have been caused by bare feet. He asserts that his actions alone did not indicate an intent to use the shoes as a weapon, and that therefore his conviction should be reversed. We disagree.

This court has traditionally looked to the use to which an object was put during an assault in determining whether that object was a dangerous weapon. "The trier of fact must consider whether the object or material is known to be 'likely to produce death or great bodily injury' in the manner it is used, intended to be used, or threatened to be used." *Williamson v. United States*, 445 A.2d 975, 979 (D.C. 1982) (citation omitted). Similarly, "an instrument capable of producing death or serious bodily injury *by its manner of use* qualifies as a dangerous weapon, whether it is used to effect an attack or is handled with reckless disregard for the safety of others." *Powell v. United States*, 485 A.2d 596, 601 (D.C.1984) (emphasis added), *cert. denied*, 474 U.S. 981, 106 S.Ct. 420, 88 L.Ed.2d 339 (1985); *see Scott v. United States*, 243 A.2d 54, 56 (D.C.1968) (any object which is "*likely* to produce death or great bodily injury by the use made of it" is a dangerous weapon (emphasis in original; footnote omitted)). Indeed, as the government points out, the *Medlin* case itself, which first held in this jurisdiction that shoes on feet can be dangerous weapons, "exemplifies the appropriate test" by limiting its holding to shoes which inflict serious injuries. 93 U.S.App.D.C. at 65, 207 F.2d at 33. This use-oriented approach has also been followed by courts in other jurisdictions to sustain convictions of aggravated assault in cases involving shoes on feet. *E.g., People v. Carter*, 53 N.Y.2d 113, 116, 423 N.E.2d 30, 32, 440 N.Y.S.2d 607, 609 (1981) ("It is the temporary use rather than the inherent vice of the object

which brings it within the purview of the statute"); *Smith v. State,* 79 Okla.Crim. 151, 155, 152 P.2d 279, 281 (1944) ("The manner of their use would determine the fact as to whether or not they were a dangerous weapon").

The injury inflicted by an object is another important factor, often a decisive factor, in establishing its dangerousness. "The best evidence of [an object's] dangerous character ... [is] the injury actually inflicted by it." *Hopkins v. United States,* 4 App.D.C. 430, 442 (1894); *accord, e.g., Edwards v. United States,* 583 A.2d 661, 665 (D.C.1990); *Freeman v. United States,* 391 A.2d 239, 242 (D.C.1978). Evidence of serious injury resulting from an assault with a certain object is very strong evidence of the dangerous character of that object.

The evidence in the instant case was very detailed in both of these respects. The testimony contained numerous references to Arthur's shoes. Although the shoes themselves were not introduced into evidence, they were consistently described as "sneakers," "tennies," and "tennis shoes." Jeremi DeGrace, Sean Williams, and Arthur himself testified that he was wearing these shoes as he stomped on Ms. DeGrace's head. Mr. Chappelle, the social worker, noticed blood on Arthur's right shoe, "and the reason why it stood out [was that] the tennies looked so new. They were brand new." Arthur does not dispute that the jury could rely on its common experience in determining what "brand new" sneakers looked like and felt like.[5] The injuries inflicted on Ms. DeGrace by Arthur's stomping were also extensively detailed at trial. The paramedic who arrived with the ambulance, the doctor who diagnosed and treated her at the MedStar shock-trauma unit, and her rehabilitation doctor all testified as to the extent of her injuries. The jury, again relying on its common experience, could reasonably infer that a sneaker on Arthur's foot, used in the manner described by the witnesses, was capable of causing these injuries. This was all that the government needed to prove in order to establish that the sneaker in this case was a dangerous weapon.

The argument that Arthur makes here has been considered and rejected by courts in other jurisdictions.[6] In *State v. Taylor,* 485 So.2d 117 (La.App.1986), the defendant kicked and stomped his victim in the face and head while wearing tennis shoes. The defendant challenged the sufficiency of the evidence because the state failed to introduce the shoe or prove that any particular type of shoe was used in the assault. The court rejected his claim:

> [Three] eye witnesses testified that defendant was kicking and stomping the victim in the face and about the head while [two other persons] held the victim down. Common sense dictates that death or great bodily harm is calculated or the likely result. The witnesses further testified that the victim was bleeding profusely from his nose and mouth. There was ample evidence in this record for the jury to find that the defendant used his shoes in a manner calculated to produce great bodily harm. We conclude that *a tennis shoe, used in this manner, is a dangerous weapon* for the purpose of aggravated battery.

*Id.* at 119 (emphasis added).

The Massachusetts Appeals Court reached the same conclusion in *Commonwealth v. Marrero,* 19 Mass.App. 921, 471 N.E.2d 1356 (1984). The defendant in that case was convicted of assault with a dangerous weapon arising out of an incident in which he kicked his victim, "jumping up and down on him with 'karate kicks.'" *Id.* at 921, 471 N.E.2d at 1357. The victim testified on direct examination that the defendant was wearing boots, but on cross-examination he said that they were not boots but sneakers. The defendant argued on appeal "that the jury did not have enough evidence before them, by way of a

---

**5.** As defense counsel told the jury in his summation, "you all know what sneakers are like."

**6.** The only District of Columbia case in which this precise argument was raised with respect to sneakers appears to be *Blue v. United States,* 119 U.S.App.D.C. 315, 342 F.2d 894 (1964), *cert. denied,* 380 U.S. 944, 85 S.Ct. 1029, 13 L.Ed.2d 964 (1965). The court rejected it in a footnote. *Id.* at 316 n. 1, 342 F.2d at 895 n. 1.

description of his footwear, to warrant a conclusion that the footwear had been used as a dangerous weapon." *Id.* The court disagreed:

> Footwear, such as a shoe, when used to kick, can be a dangerous weapon.... The essential question, when an object which is not dangerous *per se* is alleged to be a dangerous weapon, is whether the object, *as used by the defendant,* is capable of producing serious bodily harm.... [T]here was sufficient evidence in the victim's testimony detailing the kicking and stomping administered by the defendant, and in the nature of his injuries, including the evidence that his chest bore the mark of "footprints," for the jury to find ... that the defendant had worn boots and that the boots had been used as a dangerous weapon.... (*To the extent that it is argued that there should have been a required finding of not guilty on the theory that sneakers had been the weapon, the motion was also properly denied* for the reasons discussed above.)

*Id.* at 922–23, 471 N.E.2d at 1357–1358 (citations and footnote omitted; emphasis added).

 Arthur's reliance on *Reed v. United States,* 584 A.2d 585 (D.C.1990), is misplaced. In *Reed* we said that "[w]hile certain objects are weapons by design, for instance, a handgun or a switchblade, other objects become weapons only when there is some general intent for them to be a weapon." *Id.* at 588. Such general intent, however, may be inferred from evidence of the manner in which the object was used, *i.e.,* evidence that the object was in fact used as a weapon. As we have already held, such evidence was abundant here. Arthur cites no case, and we have found none, stating that the government must prove in addition that the weapon caused an injury greater than that which could have been inflicted by a bare hand (or an unshod foot). *See*

*Moore v. United States,* 599 A.2d 1381, 1383 n. 1 (D.C.1991) ("no support" for contention that jury had to compare—and presumably be instructed to compare—seriousness of injuries from kick with boot with those that would have resulted if defendant had not been wearing boot). Thus his assertion that the government did not establish his intent to injure Ms. DeGrace *with the shoe,* even if true, is irrelevant. *See Parker v. United States,* 123 U.S.App.D.C. 343, 346–347, 359 F.2d 1009, 1012–1013 (1966).[7]

The judgment of conviction is accordingly

*Affirmed.*

---

7. The government did have to prove that Arthur had a specific intent to kill Ms. DeGrace, since he was charged with assault with intent to kill while armed. There was, however, ample evidence of that intent, both in his behavior and in the comment, "I hope she's dead," which he made (twice) when he first started to leave the room before discovering that his victim was still alive. *See Bedney v. United States,* 471 A.2d 1022, 1024–1025 (D.C.1984); *United States v. Bridges,* 139 U.S.App.D.C. 259, 261, 432 F.2d 692, 694 (1970).