**Israel RIVERA, Appellant**

v.

**UNITED STATES, Appellee.**

**Nos. 05–CF–1418, 06–CO–928.**

District of Columbia Court of Appeals.

Argued Jan. 15, 2008.
Decided Jan. 31, 2008.

436

M. Azhar Khan, for appellant.

Allison L. Barlotta, Assistant United States Attorney, with whom Jeffrey A.

Taylor, United States Attorney, and Roy W. McLeese III, Tejpal S. Chawla, and James S. Sweeney, Assistant United States Attorneys, were on the brief, for appellee.

Before WASHINGTON, Chief Judge, and REID and THOMPSON, Associate Judges.

REID, Associate Judge:

A jury convicted appellant, Israel Rivera, on the charge of assaulting, resisting or interfering with a police officer with a dangerous weapon (belt with buckle), in violation of D.C.Code § 22–405(b) (2001). Subsequently, he filed a motion to vacate his sentence on the grounds of ineffective assistance of counsel. He claims that the trial court erred by (1) telling the jury "to be cautious" in handling the belt; (2) denying his motion for judgment of acquittal; and (3) failing to find ineffective assistance of counsel since his counsel did not (a) request a court certified interpreter to facilitate appellant's communication with his counsel, (b) prevent a defense witness from using the word "gang," and (3) call his brother as a witness on the issue of self-defense. Discerning neither error nor abuse of discretion, we affirm the judgment of the trial court.

## FACTUAL SUMMARY

The government presented evidence at trial showing that Metropolitan Police Department ("MPD") Officers James Ellis [1] and Michael Lawrence were on duty in the 3700 block of Fourteenth Street, in the Northwest quadrant of the District of Columbia, around 3 a.m. on October 16, 2004, monitoring the closing of a night club.

---

1. The record includes apparently mistaken references to "Officer Wells" or "Officer James Wells," instead of "Officer Ellis" or "Officer James Ellis." The trial transcript reveals testimony by Officer James Ellis who indicated that he was on duty the night in question with his partner, Officer Lawrence.

They were in an unmarked vehicle and wore civilian clothes, and had on raid jackets. Officer Ellis testified that his light blue raid jacket had the letters "MPD" in bright yellow on the back and the sleeves of the jacket, and a police badge on the front of the jacket. Officer Lawrence stated that his jacket had "POLICE in big letters on the back," an MPD "shoulder patch on the left shoulder," "POLICE sewn in on the breast on the right side," and an MPD badge. After being shown and identifying a government exhibit as the raid jacket he wore on October 16th, he described the back of the jacket as having "[g]old lettering, [and] the words Metropolitan Police, Washington, D.C.," with "the largest word on the back" being "Police." There was an "MPD shoulder patch" on the left arm of the jacket; in gold lettering on the front right of the jacket appeared the words "Four D Police"; and on the left front of the jacket there was a gold "Metropolitan Police Department badge."

Officer Ellis recalled that while he and Officer Lawrence were sitting in their vehicle, two other officers, Travis Barton and Keith Batton, pulled up in a car, informed Officers Ellis and Lawrence about a fight a block away, and asked for backup. Officer Lawrence remembered that he had spoken with Officer Barton on his "Nextel" about the fight, and that when he and his partner passed by, Officers Ellis and Lawrence followed the other two officers to Fourteenth and Perry Place. Upon their arrival, Officer Ellis "observed one Hispanic male chasing another Hispanic male in the street ...", and Officer Lawrence "saw three [persons] [ ] getting ready to fight ..., chasing each other around." Officers Lawrence and Barton each stopped one male. Officer Batton replaced Officer Barton in holding one of the suspects, while Officer Lawrence continued to subdue the other individual. As Officer Law-

rence "was taking [one of the men] to the ground, [he] felt a pain ... in his right upper arm." He looked around and saw "a black belt with a silver buckle laying on the ground."

At one point, Officer Ellis "turn[ed] around and observe[d] Officer Lawrence getting hit, struck by a belt" while he was securing one suspect on the ground, "with his back toward the defendant." Officer Barton also witnessed Mr. Rivera swinging the belt and striking Officer Lawrence. And, Officer Batton "looked over" and saw Mr. Rivera hitting Officer Lawrence with the belt. Officer Ellis said that Mr. Rivera was "striking Officer Lawrence with the buckle end of the belt," forcefully. Officer Ellis pulled Mr. Rivera off of Officer Lawrence and restrained him, with the help of Officer Barton. Eventually, when Officer Lawrence took off his raid jacket and the sweatshirt that he was wearing under it, Officer Ellis saw "a large welt on his arm in the shape of a belt buckle." Officer Ellis identified two government exhibits as photographs of Officer Lawrence's arm which depicted the "bruising to his arm that occurred during the incident," and also identified another government exhibit as the belt Mr. Rivera used in assaulting Officer Lawrence. Officer Lawrence testified that he "sustained a bruise on [his] upper arm," and he identified a government exhibit of his arm reflecting "a red bruise in the shape of a belt buckle on [his] upper right arm." Officer Batton, who placed the belt in an evidence bag, described it as having a "silver metal buckle" which was "about a little over two inches" in length.

### ANALYSIS

#### The Trial Judge's Comment to the Jury Concerning the Belt

■ Mr. Rivera complains that the trial court "over the objection of the defense

counsel and the prosecutor, . . . instructed the jury that 'If you use the belt, be cautious.'" He argues that the "[t]rial judge implicitly instructed [ ] the jury that [the] belt was inherently a dangerous weapon," a "fact [ ] to be decided by the jury." The government contends that the trial court did not abuse its discretion, and that "[t]he court's remark that the jury should 'use caution' if it decided to use the belt was reasonable under the circumstances, and did not prevent the jury from deciding whether the belt had been used as a dangerous weapon in the particular circumstances of this case."

The record shows that the trial court gave its final instructions to the jury on Thursday, February 24, 2005. On Monday, February 28, 2005, the trial judge informed government and defense counsel that "since both of you have been going around the courtroom very quickly almost approaching the jury to re-enact the scene," he had to "tell them the cautionary use of the belt in the jury deliberation room." He explained that if he did not "say something and if there is a re-enactment in the jury room and if something happens, then [he would] wish that [he] had said something." He added, "a person could be hurt by the belt." Defense counsel asked the judge not to say anything because "stating that they could hurt someone or that they could hurt someone with it, that is encroaching on their duty to find the facts." Defense counsel requested that if the court told the jurors "to be cautious," that it refrain from saying "that someone will be hurt." Government counsel also voiced objection to the trial court's plan to tell the jury to be cautious in using the belt.

After the bench conference, the trial court discussed certain "administrative things" with the jurors. With reference to items admitted into evidence, the judge declared:

[W]e will give you all of the evidence that is admitted into evidence.

If there is something that you don't have, it's because we did not give it to you. That includes the belt.

If you use the belt in any way, be cautious. We also are going to give you . . . three copies of my final instructions to you along with the verdict form.

In giving its final instructions on February 24, the trial court did not mention the belt in describing the elements of the crime with which Mr. Rivera was charged. With respect to "dangerous weapon," the court instructed the jury, in part, that "[a] weapon is dangerous if it is used in a manner likely to produce death or great bodily injury." The court continued, in part, "Voluntarily pointing a dangerous weapon at another person in a threatening manner or voluntarily using it in a way that would reasonably create in the person a fear of imminent injury would be assault with a dangerous weapon."

▮ "It is well established that a trial judge may comment upon the evidence in a criminal case so long as the ultimate resolution of factual issues is clearly left to the jury." *Hall v. United States*, 383 A.2d 1086, 1088 (D.C.1978). But, "[i]f the probable effect of a trial judge's comment is to overcome the will of the jury and to substitute the court's views for that of the jury, the comment becomes prejudicial error." *Id.* at 1089. Furthermore, we review the challenged comment of the judge in the context of the overall charge, rather than in isolation. *See Rorie v. United States*, 882 A.2d 763, 771 (D.C.2005).

Here, during its final instructions, the trial judge properly instructed the jury on what constitutes a dangerous weapon, without any reference to the belt. The only question is whether the trial judge's

later direction to the jury "to be cautious" in handling the belt had the effect of ultimately resolving the factual issue concerning the dangerousness of the belt. Viewing the trial court's instructions to the jury as a whole, we conclude that the court did not resolve the factual question-whether Mr. Rivera used the belt in a manner likely to produce great bodily injury. We are convinced that the trial judge did not comment directly on the evidence and Mr. Rivera's guilt, or "invade[ ] the fact-finding function of the jury," *see Prezzi v. United States,* 62 A.2d 196, 200 (D.C.1948); nor did the trial court "partially direct a verdict as a legal matter, ... [or,] as a practical matter, shift[ ] the burden of persuasion on an element of the crime from the government to appellant.," *see Henderson v. United States,* 527 A.2d 1262, 1265 (D.C. 1987). Rather, the trial judge said "be cautious" out of apparent concern that one juror might inadvertently hit another in trying to re-enact, in the confines of the jury deliberation room, Mr. Rivera's alleged striking of Officer Lawrence with the belt. Given the objection of both defense counsel and the prosecutor, the urge to make the comment perhaps should have been avoided and the matter left to the common sense of the jurors, but we see neither abuse of discretion nor legal error since the trial judge did not invade the fact-finding province of the jury to determine whether the manner in which the belt was used made it a dangerous weapon. *Hall, supra,* 383 A.2d at 1088.

### The Motion for Judgment of Acquittal

Mr. Rivera asserts that the trial court erred by not granting his motion for judgment of acquittal, because "[t]he government did not prove that [he] knew that Officer Lawrence was a police officer." In a supplemental brief he argues that "[a] belt is not a dangerous weapon *per se,*" and that "the government failed to prove that [the] belt used by [Mr.] Rivera was

likely to cause great or serious bodily harm."

"When this court considers a claim of evidentiary insufficiency, it must view the evidence in the light most favorable to the government, giving full play to the right of the jury to determine credibility, weigh evidence, and draw justifiable inferences of fact." *Freeman v. United States,* 912 A.2d 1213, 1218 (D.C.2006) (citation and internal quotation marks omitted). "[I]t is only where the government has produced no evidence from which a reasonable mind might fairly infer guilt beyond a reasonable doubt that this court can reverse a conviction." *Id.* at 1219 (citation omitted). "To convict a defendant of assault on a police officer with a dangerous weapon, the government must prove (1) the elements of simple assault, (2) the use of a dangerous weapon by the defendant in the commission of the assault, and (3) that the defendant knew or should have known that the victim was a police officer." *Carter v. United States,* 531 A.2d 956, 961 n. 12 (D.C.1987) (citations omitted). "When the object used ... is not a dangerous weapon *per se,* the prosecution must prove that the object is one which is likely to produce death or great bodily injury by the use made of it." *Dorsey v. United States,* 902 A.2d 107, 111 (D.C.2006) (citations and internal quotation marks omitted).

Here, there is substantial and compelling evidence that Mr. Rivera knew or should have known that Officer Lawrence was a police officer. The record shows that Officer Lawrence was wearing his light blue raid jacket with gold lettering on the back reading Metropolitan Police, Washington, D.C.; that Officer Lawrence had his back to Mr. Rivera; and that an MPD shoulder patch appeared on the left arm of the officer's jacket. Further-

more, there also was substantial and compelling evidence presented at trial that Mr. Rivera used the belt in a manner likely to produce great bodily injury. According to Officer Batton, the belt had a "silver metal buckle" "about a little over two inches" in length. Officer Ellis testified that Mr. Rivera "just [kept] swinging back striking Officer Lawrence on the back and on the arm"; and "[h]e was striking with quite a bit of force, [ ] because [as] he was hitting, you could hear a popping off of Officer Lawrence's jacket." Officer Barton witnessed Mr. Rivera swinging the belt "three times" and "very rapidly" at Officer Lawrence. During his testimony, Officer Lawrence stated that as he "was taking [Mr. Rivera] to the ground[, he] felt a pain ... in his upper right arm." Notably, he felt the pain through his raid jacket and his sweatshirt. Officer Lawrence sustained a bruise on his upper right arm. Photographs revealed "a red bruise in the shape of a belt buckle on [his] right upper arm." Based on this evidence, reasonable jurors could conclude that Mr. Rivera used the belt in a manner likely to cause great bodily injury, hitting the officer with such force that it produced a "popping sound." The type of blow that Mr. Rivera struck penetrated Officer Lawrence's arm and left the imprint of the belt buckle despite the officer's jacket and sweatshirt. This case is similar to *Dorsey, supra*, a case involving a charge of attempted possession of a prohibited weapon where appellant used a black Timberland belt with a buckle in disciplining his son. Mr. Dorsey struck his son with such force that the belt left redness in one of the boy's eyes, "broad redness" across his face and two marks on his left cheek. *Id.* at 111. We distinguished *Dorsey* from *Alfaro v. United States*, 859 A.2d 149 (D.C.2004) (involving convictions of simple assault and attempted second-degree cruelty to children), on which Mr. Rivera relies:

Unlike our decision in *Alfaro*, [ ] where the evidence was insufficient to sustain a conviction of attempted possession of a prohibited weapon (a telephone cord), *id.* at 162, there is sufficient evidence in this case from which a trier of fact could reasonably find that the black Timberland belt used as Mr. Dorsey did, not only left visible redness on [the victim's] face, including a red patch directly under his right eye, but also was "likely to produce great bodily injury," [*id.* at 161] (citation omitted), and created a substantial risk of "protracted loss or impairment of the function of a bodily member or organ," his eye.

*Dorsey, supra*, 902 A.2d at 112 (other citation omitted). Similarly, in this case Mr. Rivera's forceful use of the belt and attached metal buckle produced a red bruise and left an imprint on his arm. Reasonable jurors could find that Mr. Rivera's repeated manner of striking Officer Lawrence with a belt that had a metal buckle a little more than two inches in length created a substantial risk that the officer's arm would be impaired seriously, or that there would be a protracted loss of the function of his arm. In short, on this record we cannot say that the trial court erred by denying Mr. Rivera's motion for judgment of acquittal on the basis of appellant's assertion that the belt was not a dangerous weapon used in a manner that could cause great bodily injury.

### The Ineffective Assistance of Counsel Claim

Mr. Rivera faults the trial court for denying his motion under D.C.Code § 23–110 on the ground that his trial counsel rendered ineffective assistance of counsel. "We review the denial of a § 23–110 motion for an abuse of discretion." *Cade v. United States*, 898 A.2d 349, 354 (D.C.2006) (citations omitted).

"To establish ineffective assistance of counsel, an appellant must demonstrate first that his trial counsel's performance was deficient ...," and must "also demonstrate that the deficient performance resulted in prejudice that deprived the defendant of a fair trial." *Jenkins v. United States,* 870 A.2d 27, 33–34 (D.C.2005) (quoting *Strickland v. Washington,* 466 U.S. 668, 687, 689–91, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (internal quotation marks omitted)); *see also Zanders v. United States,* 678 A.2d 556, 569 (D.C.1996).

 Mr. Rivera first claims that his counsel's performance was deficient because she failed to request a court-appointed interpreter to facilitate his communication with his attorney. The District of Columbia Interpreters for Hearing–Impaired and Non–English Speaking Persons Act ("the Interpreter Act") specifies, in part, that "in any criminal prosecution the court shall, upon the request of a 'communication-impaired' person, appoint a qualified interpreter to interpret the proceedings for him and to interpret his testimony." *Ko v. United States,* 722 A.2d 830, 835 (D.C.1998) (citing D.C.Code § 31–2702(a) (1998)), [now recodified at D.C.Code § 2–1902 (2007)]. A communication-impaired person (defined as a non-English or limited-English speaking person, *see* D.C.Code § 2–1901) is "entitled to the appointment of a qualified interpreter 'to assist in communication with counsel in all phases of the preparation and presentation of the case.'" *Ramirez v. United States,* 877 A.2d 1040, 1042 n. 2 (D.C.2005) (quoting D.C.Code § 2–1902(b)). However, "this right 'may be waived if it is not raised in timely fash-

ion.'" *Id.* at 1044. "The defendant must make the court aware of any difficulties with the translator, since 'to allow a defendant to remain silent throughout the trial and then, upon being found guilty, to assert a claim of inadequate translation would be an open invitation to abuse.'" *Id.* (citations omitted).

 Here, Mr. Rivera never requested an interpreter for his use during his conversations with counsel, and therefore, he waived that right as *Ramirez* indicates. Nevertheless, even assuming that he did not waive that right, on this record he cannot prevail on his argument. Significantly, Mr. Rivera's counsel spoke some Spanish, although not fluently, and the defense investigator, who was fluent in Spanish, as well as his wife, who was bilingual, translated the attorney/client conversations when appellant and his counsel were not able to understand each other. The fact that Mr. Rivera's wife had only a ninth grade education, in and of itself, does not mean that she could not accurately translate an exchange of words between appellant and his counsel. Furthermore, before he filed the collateral attack on his conviction, Mr. Rivera never complained about his inability to understand his counsel, and in his testimony at his § 23–110 hearing, and also in his brief, he did not identify any specific communication with counsel which he did not comprehend, nor any specific instance in which he was prejudiced by not having a court-appointed interpreter to translate his conversations with his counsel. In his brief, he stated that Mr. Rivera "appeared to be very confused about his right to testify," but did not elaborate.[2] Rather, he insisted that

---

2. In his brief, Mr. Rivera asserts that "trial counsel advised him not to testify." During the § 23–110 hearing, however, the trial court declared: "It's clear counsel wanted defen-

dant to testify. It was defendant who made the choice not to testify." Defense counsel's affidavit revealed that Mr. Rivera's decision not to testify was attributable to his reaction

we should presume prejudice. Even if we assume that Mr. Rivera did not waive his Interpreter Act argument, we agree with the trial court that Mr. Rivera did not sustain his burden to show that defense counsel's performance was deficient because she did not request an interpreter for the attorney/client conversations; nor did he satisfy the prejudice prong of *Strickland.*

■ Second, Mr. Rivera argues that his trial counsel's performance was deficient because she did not prepare defense witness Karla Romero for her testimony sufficiently to avoid her use of the word "gang." He maintains that he was prejudiced because Ms. Romero's testimony "connected [him] with MS," a gang. In an affidavit responding to Mr. Rivera's § 23–110 motion, defense counsel declared that prior to Ms. Romero's trial testimony, she advised her "not to mention anything about gangs when she testified as it had nothing to do with Mr. Rivera or the case." Defense counsel's investigator also "reminded Ms. Romero not to mention anything relating to gangs." And, the trial court determined that "[t]he record does not reflect that [Mr. Rivera] was a gang member[,] nor did the government argue that. . . ." Under these circumstances the trial judge was correct in declaring that even assuming, without deciding, that defense counsel did not properly prepare Ms. Romero to avoid reference to gangs, Mr. Rivera suffered no prejudice since there was no evidence in the record connecting him to any gang.

■ Third, Mr. Rivera alleged deficient performance by his trial counsel because she did not call his brother, Marco Rivera, as a defense witness to show that

appellant acted in self-defense. In her affidavit, defense counsel explained that she made a tactical decision not to call Marco Rivera as a witness because his account of the incident in question differed from that of Ms. Romero and that of appellant. Moreover, defense counsel's affidavit stated: "Most significantly, Mr. Marco Rivera's version made Mr. Israel Rivera an aggressor as opposed to simply jumping to the aid and defending a third party." It is well settled that "the decision to call witnesses is a judgment left almost exclusively to counsel." *Oliver v. United States,* 832 A.2d 153, 158 (D.C.2003) (citation and internal quotation marks omitted). Generally, the court does not "second-guess" a trial counsel's tactical decisions, *see Brown v. United States,* 934 A.2d 930, 943 (D.C.2007) (referencing *Carter v. United States,* 475 A.2d 1118, 1123 (D.C.1984)); and "[t]rial tactical decisions generally do not result in a finding of ineffective assistance," *Zanders, supra,* 678 A.2d at 569. Consequently, we agree with the trial court that "not calling Marco Rivera [as a defense witness] was a reasonable tactical choice," that did not constitute deficient performance. In short, the trial court did not abuse its discretion in denying Mr. Rivera's D.C.Code § 23–110 on the three grounds asserted by Mr. Rivera.

Accordingly, for the foregoing reasons, we affirm the judgments of the trial court.

*So ordered.*

to the cross-examination of Ms. Romero. He "became very nervous and concerned about his lack of education and the fact that he became easily confused as a result of this lack

of any formal education." Defense counsel's efforts to allay his fears were unsuccessful and, as the trial court found, Mr. Rivera himself made the decision not to testify.