*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 22-CM-0580

BRITTANY SHANTEL CARRINGTON, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2021-CMD-002149)

(Hon. Robert I. Richter, Trial Judge)

(Argued March 21, 2024      Decided October 2, 2025)

*Fleming Terrell*, Public Defender Service, with whom *Samia Fam* and *Alice Wang*, Public Defender Service, were on the supplemental briefs for appellant. *Geneva Vanderhorst* was on the opening briefs for appellant.

*Nicholas G. Miranda*, Assistant United States Attorney, with whom *Matthew M. Graves*, United States Attorney at the time of argument, and *Chrisellen R. Kolb* and *Daniel Bromwich*, Assistant United States Attorneys, were on the brief for appellee.

Before HOWARD and SHANKER, *Associate Judges*, and THOMPSON, *Senior Judge*.

HOWARD, *Associate Judge*: Appellant Brittany Shantel Carrington[*] was convicted of one count of simple assault, one count of destruction of property less than $1000, and one count of attempted possession of a prohibited weapon (attempted PPW). On appeal, she argues that the evidence was insufficient to support her convictions. We affirm in part and reverse in part, vacating Ms. Carrington's attempted PPW conviction.

## I. Background

On November 9, 2020, two cars collided outside of a Safeway parking lot resulting in a minor accident. Ms. Carrington drove a gray sedan with three other women as passengers, including her seventeen-year-old daughter A.C.; Ms. Brooklyn Brown drove a Jeep Compass with her then fiancée, now wife, Marylynn Jones, as a passenger. After the collision, both parties got out of their cars to exchange insurance information and the interaction devolved into a brawl. Because the parties' stories differ, we briefly cover, as relevant, each account below.

---

[*] Appellant's unopposed motion for leave to file the lodged supplemental reply brief is granted and the appellant's lodged supplemental reply brief shall be filed.

## A. Ms. Carrington's Account

According to Ms. Carrington, once she was out of the car, Ms. Brown and Ms. Jones were already out of their car, cursing and yelling at her and her daughter A.C. about hitting their car. As Ms. Carrington moved to get her insurance paperwork, A.C. informed her that Ms. Brown and Ms. Jones were taking a picture of Ms. Carrington's license plate. In turn, A.C. tried to take a picture of Ms. Brown's license plate, and Ms. Jones smacked A.C.'s phone out of her hand and pushed her. Ms. Carrington intervened, and an altercation began between her and Ms. Jones, which took the two to the ground and bloodied Ms. Carrington's mouth. A.C. managed to separate the two, and Ms. Carrington then returned to her car and drank water.

Ms. Carrington testified that, following her retreat to her car, Ms. Jones came back over and began striking her again, before A.C. "got [Ms. Jones] off of her." Witnessing Ms. Jones fighting A.C. and overpowering her, Ms. Carrington decided to get an umbrella from her car and "swing it around to get everyone's attention to stop the fighting." Ms. Carrington alleged that at that point one of the other women took the umbrella out of her hand and hit both Ms. Jones and her car windshield. Ms. Carrington claimed she was unaware who put the umbrella back in her car.

Ms. Carrington further testified that she acted out of self-defense, that she started fighting only to protect her teenage daughter, and that, due to her recent surgery, she would not have been strong enough to swing the umbrella to cause any harm.

## B.     The Government's Account

According to the government, Ms. Brown and Ms. Jones were confronted by Ms. Carrington and three other occupants of her car when they got out to exchange insurance information.  Ms. Brown testified that she and Ms. Jones got out of the car to exchange insurance information, and Ms. Brown stepped away to get the contact information of a witness.  Ms. Jones testified that upon exiting the vehicle, she took or tried to take a picture of Ms. Carrington's license plate.  Ms. Brown decided to call the police, and once she did, "people were screaming [and] yelling."  Then suddenly people started attacking the couple and, according to Ms. Brown, her phone got shattered.  Neither Ms. Brown nor Ms. Jones could identify which of the women from Ms. Carrington's car started the fight, but they said that Ms. Carrington's group attacked first.  At a point when the fighting slowed down, the police called Ms. Brown back, and she testified, while she was on the call Ms. Carrington went into her car and came back out with an umbrella.  Ms. Brown testified that Ms. Carrington hit the windshield, and when Ms. Jones tried to stop

her, Ms. Carrington hit Ms. Jones with the umbrella. Ms. Jones sustained injuries to her face and elbow from the altercation.

### C.      Mutually Agreed Upon Facts

Both parties agree that Ms. Brown called the police again, and when officers arrived, they "arrested [Ms.] Carrington and recovered the main part of the umbrella from [Ms.] Carrington's car." When an officer asked Ms. Carrington how the umbrella became involved, she responded, "Because her girlfriend was jumping in it, so I get my umbrella out of the car and I'm breaking it up and boom."[1] Ms. Carrington said she did not know how the window or Ms. Jones were hit because she started fighting again. Neither Ms. Brown nor Ms. Jones could definitively identify who hit the car windshield and Ms. Jones. However, Ms. Brown identified the person who hit the windshield as "the driver" of the other car (Ms. Carrington).

### D.      Trial Court Findings

Based on the brawl, the government charged Ms. Carrington with one count of simple assault in violation of D.C. Code § 22-404, one count of destruction of

---

[1] Ms. Carrington did not explain whether, by her reference to "breaking it up," she meant the fight or the umbrella (which Government Exhibit 4B shows was broken).

property less than $1000 in violation of D.C. Code § 22-303, and one count of attempted PPW in violation of D.C. Code § 22-4514(b). She pled not guilty to all counts.

The trial judge noted the lack of clarity in the facts surrounding the altercation, expressing that they "would certainly have a hard time finding anything beyond a reasonable doubt in terms of how this thing started." The trial court determined that the real issue was "who was holding the umbrella when the windshield was broken[] and [when] Ms. Jones was hit." Ms. Carrington said she was "the person [who] went into the car" and the one who "swung the umbrella around to try to scare people," but that someone else grabbed the umbrella from her and hit the windshield and Ms. Jones. The court found Ms. Carrington's story incredible, and credited Ms. Brown's identification of Ms. Carrington as the driver who got the umbrella out of the car, broke the windshield, and hit Ms. Jones, especially given that Ms. Carrington admitted that she got the umbrella and swung it around. As such, the trial judge found beyond a reasonable doubt that Ms. Carrington broke the windshield and hit Ms. Jones. The trial judge also found that, while the umbrella may not have been a prohibited weapon while in the car, at the point where Ms. Carrington broke the windshield and hit Ms. Jones, it was used as a weapon without sufficient justification. Consequently, the judge found Ms. Carrington "guilty of all three charges." The trial judge imposed a sentence of forty days on

each charge but suspended the execution of the sentence; one year of unsupervised probation; and $50 for each charge to the victim's fund. This timely appeal followed.

## II.     Standard of Review

This court reviews sufficiency of evidence challenges de novo. *Russell v. United States*, 65 A.3d 1172, 1176 (D.C. 2013); *see also Slater-El v. United States*, 142 A.3d 530, 538 (D.C. 2016). "When considering an insufficiency-of-the-evidence claim, 'we view the evidence in the light most favorable to the government, giving full play to the right of the [factfinder] to determine credibility, weigh the evidence, and draw justifiable inferences of fact, and making no distinction between direct and circumstantial evidence.'" *Slater-El*, 142 A.3d at 538 (alteration in original) (quoting *Medley v. United States*, 104 A.3d 115, 127 n.16 (D.C.2014)). To prevail on a claim that the evidence was insufficient for conviction, an appellant "must establish that the government presented no evidence upon which a reasonable mind could find guilt beyond a reasonable doubt." *Russell*, 65 A.3d at 1176 (internal quotation marks omitted) (quoting *Peery v. United States*, 849 A.2d 999, 1001 (D.C. 2004)).

The foregoing standard is "deferential," *Swinton v. United States*, 902 A.2d 772, 776 n.6 (D.C. 2006), "but it is not a rubber stamp," *id.*, and it is by no means

"toothless." *Evans v. United States*, 122 A.3d 876, 887 (D.C. 2015) (internal quotation marks omitted) (quoting *Rivas v. United States*, 783 A.2d 125, 134 (D.C. 2001) (en banc)). "[A]lthough a [fact-finder] is entitled to draw a vast range of reasonable inferences from evidence, [the fact-finder] may not base a verdict on mere speculation." *Id.* (alterations in original) (quoting *Schools v. United States*, 84 A.3d 503, 508 (D.C. 2013)).

### III. Discussion

On appeal, Ms. Carrington raises five arguments. First, she argues (A) that the trial court erroneously credited Ms. Brown's "inherently incredible" testimony. Next, Ms. Carrington asserts (B) that the trial court impermissibly credited Ms. Brown's testimony identifying Ms. Carrington as the assailant. Alternatively, Ms. Carrington contends that, if we conclude that she was the assailant, (C) the trial court erroneously failed to credit her self-defense claim. She also argues (D) that the government failed to establish that she possessed the requisite intent to commit assault. Finally, Ms. Carrington asserts (E) that the trial court erroneously found that

the umbrella was a "dangerous weapon" under D.C. Code § 22-4514(b).[2] We address each argument in turn.

### A. Ms. Brown's Testimony Is Not Inherently Incredible

"This court will not reverse a trial court's factual findings after a bench trial unless those findings are plainly wrong or without evidence to support them." *Evans*, 122 A.3d at 887 (internal quotation marks and alterations omitted) (quoting D.C. Code § 17-305(a) (2012 Repl.)).

Almost without exception, "[t]he determination of credibility is for the finder of fact and is entitled to substantial deference." *Bouknight v. United States*, 867 A.2d 245, 251 (D.C. 2005) (citing *Byrd v. United States*, 614 A.2d 25, 30 (D.C. 1992)). However, "[t]he one exception to th[e] general rule [that the determination of credibility is for the finder of fact, and is entitled to substantial deference,] is if the testimony of a witness is inherently incredible under the circumstances." *Robinson v. United States*, 928 A.2d 717, 727 (D.C. 2007).

---

[2] Ms. Carrington also argues that the government failed to establish that she possessed the requisite intent to commit attempted PPW with regard to the umbrella. Because we determine that her conviction must be reversed because the umbrella, in this case, was not a prohibited weapon, we decline to address this argument.

Ms. Carrington cites the doctrine of inherent incredibility to argue that Ms. Brown's testimony should not have been credited. The test for inherent incredibility is "stringent," as directed by our precedent. *In re A.H.B.*, 491 A.2d 490, 496 n.8 (D.C. 1985). The doctrine of inherent incredibility is reserved for the following circumstances:

> The doctrine of inherent incredibility can be invoked only when the testimony can be disproved as a matter of logic by the uncontradicted facts or by scientific evidence, or when the person whose testimony is under scrutiny made allegations which seem highly questionable in light of common experience and knowledge, or behaved in a manner strongly at variance with the way in which we would normally expect a similarly situated person to behave.

*Payne v. United States*, 516 A.2d 484, 494 (D.C. 1986) (internal quotation marks and alterations omitted) (quoting *A.H.B.*, 491 A.2d at 496 n.8). We conclude that Ms. Carrington's assertions fail to meet the rigors of our test.

While the doctrine of inherent incredibility may apply where the testimony credited by the trial court contains internal contradictions, that is not the case here; nor does Ms. Brown's testimony defy common knowledge or the human experience. Although Ms. Brown's testimony does not align with Ms. Carrington's, that does not make it inherently incredible.

As to the alleged inconsistencies in testimony, Ms. Carrington argues that the evidence was insufficient to support her convictions because Ms. Brown's testimony was inherently incredible, and thus, a reasonable mind could not find guilt beyond a reasonable doubt based on the government's evidence. Ms. Carrington argues that, even when the evidence is viewed in the light most favorable to the government, it does not satisfy the reasonable doubt standard. Further, she argues that the trial court erred in its credibility determination by failing to consider factors beyond demeanor, including a "witness's ability to recall, interest in the outcome of the case, [] internal inconsistencies," and inconsistencies "contrary to human experience" or common knowledge. She emphasizes that Ms. Brown could not remember one of the witnesses to the accident, that Ms. Brown was distracted while trying to provide information to the 911 dispatch and police after the accident, and that Ms. Brown changed her story about speaking to a witness after reviewing body worn camera footage.

We have stated that "[a] certain amount of inconsistency in the evidence is almost inevitable in any trial, but it rarely justifies reversal." *A.H.B.*, 491 A.2d at 495 (citations omitted). In *A.H.B.*, where there were inconsistencies between two children's testimonies, including details such as "who paid for the groceries and how"; "which boy yelled 'run'"; "the height of [another child]"; and whether the child witness "saw who took the food stamps from her brother's pocket," we held

that inconsistencies and contradictions that generally involve collateral details, in testimony that is consistent on main events, did not justify reversal. *Id.* at 495-96.

Here, similarly, Ms. Brown was consistent in identifying the driver as the assailant, and her inconsistencies concerned only details that were collateral to the assault. Although she may not have remembered which car hit which or the details of her 911 call, she did consistently identify the driver as the assailant.

Beyond inconsistencies in collateral details, a story that may slightly change would still not implicate inherent incredibility. *United States v. Gutman* presented a "significant" change where a witness repudiated a story he told the FBI concerning extortion payments; the Seventh Circuit held that a witness changing their story on the stand is common and insufficient to disqualify a witness. 725 F.2d 417, 421 (7th Cir. 1984). Here, Ms. Brown changed her story about speaking to a witness after viewing the body worn camera footage, but that does not justify reversal.

Ms. Carrington points to the D.C. Circuit's decision in *Jackson v. United States* to invoke the doctrine of inherent incredibility where "the person whose testimony is under scrutiny made allegations which seem highly questionable in the light of common experience and knowledge, or behaved in a manner strongly at variance with the way in which we would normally expect a similarly situated person to behave." 353 F.2d 862, 866 (D.C. Cir. 1965) (footnotes omitted). There, the

court discredited a police officer's testimony, in which he alleged that a prostitute walked up to him and voluntarily offered a detailed description of the defendant who was possessing heroin, thus defying common experience and knowledge, and arrested the defendant on only that information. *Id*. at 864, 868. In that case, the witness denied giving that information and the officers did not behave as the court would have expected officers with such a detailed description of the suspect to behave, including arresting and searching another man despite arresting the defendant. *Id*. at 868.

Ms. Carrington identifies no grounds on which Ms. Brown defied common experience or knowledge, nor do we discern any. She certainly confused collateral details, and our review of the record suggests that both sides may have downplayed their roles in the fight. Neither puts the testimony outside of common experience or knowledge. For these reasons, we reject the application of the inherent incredibility doctrine to Ms. Brown's testimony.

### B. The Trial Court Properly Credited Testimony Regarding the Identification of the Assailant

Ms. Carrington argues that it was unreasonable for the trial court to credit Ms. Brown's testimony on the identification of the assailant, because no witness

identified Ms. Carrington. She contends that the identity provided for the assailant did not match her, based on clothing and hairstyle.

We disagree with Ms. Carrington, concluding that her argument misconstrues the testimony. Ms. Brown and Ms. Jones consistently either identified the driver as the assailant or said that only one person held the umbrella and the same person who pulled out the umbrella struck the windshield and Ms. Jones. Ms. Jones did testify that she could not identify the assailant to the police that night because it was a "chaotic" night. The parties do not dispute that Ms. Carrington was the driver. Ms. Carrington also admits to bringing the umbrella out. Further, Officer John D'Angelo, one of the officers from the Metropolitan Police Department who responded to the scene, testified that Ms. Carrington, the driver, said she "got the umbrella out to break up the fight." Ms. Brown and Ms. Jones consistently identified the driver, and Ms. Carrington admitted to being the driver and pulling out the umbrella. We discern no circumstance to justify second-guessing the trial court's determination.

### C. The Trial Court Properly Rejected Ms. Carrington's Self-Defense Claim

Ms. Carrington also argues that her claim of self-defense, involving the defense of a third party (her daughter), should have been accepted. She asserts that

the trial court should have credited her testimony and her use of this defense for three reasons. First, the trial court found that everyone was angry and acted poorly; second, its findings did not counter her testimony; and third, the court's findings contradict her testimony that she was not strong enough to swing the umbrella to hit the windshield or Ms. Jones after her surgery. While these arguments may promote Ms. Carrington's view of the case, they do not alter the credibility determinations made by the trial court and are, therefore, unavailing.[3]

"The right to defend a third person is analogous to the right of self-defense, and like self-defense, can provide a complete defense to criminal charges." *Lee v. United States*, 61 A.3d 655, 657 (D.C. 2013). When a self-defense claim supported by some evidence is raised, the threshold question is whether the government disproved, beyond a reasonable doubt, that the "appellant actually and reasonably believed that [s]he was in imminent danger of bodily harm." *Parker v. United States*, 155 A.3d 835, 845 (D.C. 2017) (alteration in original) (quoting *Higgenbottom v. United States*, 923 A.2d 891, 900 (D.C. 2007)). In the analogous case of defense of a third party, a person has the right to use reasonable force if they reasonably and

---

[3] Additionally, Ms. Carrington argues that the government's evidence regarding self-defense, presumably Ms. Brown's testimony, implicated the doctrine of inherent incredibility because it was inconsistent and uncorroborated, although she does not explain what makes it inconsistent. *Jackson*, 353 F.2d at 866.

actually believe that the third party is in imminent danger of harm. *See Lee*, 61 A.3d at 657. In this court's cases "assessing sufficiency of the evidence challenges: claims of self-defense rise or fall on determinations of whether the defendant reasonably believed herself [or a related party] to be in imminent danger of bodily harm or used excessive force." *Parker*, 155 A.3d at 847-48.

Here, Ms. Carrington did not present any evidence that she was in imminent danger of bodily harm or that her child was at the point she struck the windshield and Ms. Jones. Ms. Carrington does not venture an explanation as to what danger she or her child were in when she attacked the car and then Ms. Jones, who came over in defense of the vehicle.

It is true that the trial judge said "everyone was angry," but he compared Ms. Carrington's reaction to road rage, rather than characterizing Ms. Carrington as fearful. The judge found that breaking the windshield "has no justification or mitigation. It was simply done out of anger." Additionally, the judge found that Ms. Carrington did not have "the right of self-defense" because "Ms. Jones was clearly justified in trying to restrain her" since Ms. Carrington "instigated" the altercation. Further, while Ms. Carrington testified that she underwent surgery before the incident and was too weak to swing the umbrella and cause injury, the trial judge did not credit her testimony and was under no obligation to do so as Ms.

Carrington intimates. Based on its findings, the trial court properly rejected Ms. Carrington's self-defense claim.

### D. The Trial Court's Findings Regarding Ms. Carrington's Intent Are Sufficient

Ms. Carrington argues that "even if she was sufficiently identified as the umbrella-wielder, the prosecution still presented insufficient evidence to prove that she intended to hit Ms. Jones with the umbrella . . . ." She relies on *Williams v. United States*, 887 A.2d 1000, 1002-04 (D.C. 2005), and D.C. Code § 22-4514(b), positing that both require "[p]roof of such intent" for simple assault. We disagree with Ms. Carrington, concluding that there was sufficient evidence for the trial court to infer the requisite intent for assault. *See Perez Hernandez v. United States*, 286 A.3d 990, 1004 (D.C. 2022) (en banc) ("[T]o convict someone of [simple] assault [under an attempted-battery theory], the government must prove . . . the intent to do the act that constituted the assault" (quoting *Lewis v. United States*, 938 A.2d 771, 783 (D.C. 2007))).

As stated, we will find evidence insufficient for a conviction if an appellant "establish[es] that the government presented no evidence upon which a reasonable mind could find guilt beyond a reasonable doubt." *Russell*, 65 A.3d at 1176 (internal quotation marks omitted) (quoting *Peery*, 849 A.2d at 1001). "Under this standard

of review, we view the evidence in the light most favorable to the prevailing party and defer to the trial court's credibility determinations unless they are clearly erroneous." *In re Estate of Kittrie*, 318 A.3d 1200, 1203 (D.C. 2024) (citing *Reed v. Rowe*, 195 A.3d 1199, 1204 (D.C. 2018)). Reviewing this case in accordance with these principles, we discern no error.

Ms. Brown testified that when "[t]here was a separation . . . where the fight had . . . stopped," the "same woman who was driving"—Ms. Carrington—"went into her car[] and came back with an object," the umbrella. Ms. Brown stated that Ms. Carrington then "proceeded to run towards [her] vehicle with the object, and . . . hit[] [her] windshield with the object." Ms. Brown also testified that when Ms. Jones "attempted to stop [Ms. Carrington] from hitting the windshield . . . [Ms. Carrington] proceeded to hit [Ms. Jones] with the object."

Ms. Jones, like Ms. Brown, testified that once "the brawl just kind of died down," someone "approached [her] car very quickly and swung the umbrella at [her] window shield multiple times." Ms. Jones testified that she "tr[ied] to take the umbrella away from them[, but] [e]nded up being hit with the umbrella . . . three to four times."

The trial court found Ms. Carrington's testimony, positing that she got the umbrella out only to break up the fight, but that someone else grabbed the umbrella

from her, broke the windshield, and hit Ms. Jones, to be "incredible." The court reasoned that it seemed illogical that Ms. Carrington was too weak following her surgery to strike anyone or anything with an umbrella but somehow had the strength to swing the umbrella around to quell the altercation. The trial court did, however, credit both Ms. Jones's and Ms. Brown's testimony. Not only do we conclude that the trial court's decisions to discredit Ms. Carrington's testimony while crediting Ms. Brown's and Ms. Jones's testimony were not clearly erroneous, we also conclude that Ms. Brown's and Ms. Jones's testimony provided enough evidence for the trial court to infer intent.

According to both Ms. Brown and Ms. Jones, the fighting had ceased at the time Ms. Carrington retrieved the umbrella; and as a result, there was no need for any further action to break up the fight. Ms. Brown and Ms. Jones testified that Ms. Carrington ran to the car and struck it multiple times and Ms. Jones testified that she was hit "three or four times." Both instances demonstrate Ms. Carrington acted with the intent to use the umbrella and she had the ability to do so. *See Lewis*, 938 A.2d at 783 ("To convict someone of assault . . . the government must prove '(1) an act on the part of the defendant, (2) the apparent present ability to injure or frighten the victim, and (3) the intent to do the act that constituted the assault.'") Therefore, viewing this in the light most favorable to the government, there was sufficient evidence for the trial court to infer beyond a reasonable doubt that Ms. Carrington

intended to do the act that constituted the assault. Accordingly, we affirm Ms. Carrington's simple assault conviction.

### E. We Cannot Determine that the Umbrella Was Used as a Dangerous Weapon

Ms. Carrington was convicted of attempted PPW for unlawful use. Under D.C. Code. § 22-4514(b) "[n]o person . . . within the District of Columbia [shall] possess, with intent to use unlawfully against another, an imitation pistol, or a dagger, dirk, razor, stiletto, or knife with a blade longer than [three] inches, or other dangerous weapon." We have held that a "'dangerous weapon' is 'one which is likely to produce death or great bodily injury by the use made of it.'" *Dorsey v. United States*, 154 A.3d 106, 125 (D.C. 2017) (quoting *Tuckson v. United States*, 77 A.3d 357, 361 (D.C. 2013)).

The government argues that "the actual injury inflicted . . . is not a necessary predicate" to establish that an object is a dangerous weapon. *See Savage-El v. United States*, 902 A.2d 120 (D.C. 2006). The government asserts that instead it "need only show that 'great bodily injury' is '*likely*' to be caused by the umbrella in the manner in which it was used or threatened to be used." In support of its argument, the government references this court's precedent that it claims found "ordinary household objects" to be dangerous weapons even if they did not result in great

bodily injury. *See Rivera v. United States*, 941 A.2d 434 (D.C. 2008); *In re D.T.*, 977 A.2d 346 (D.C. 2009); *United States v. Brooks*, 330 A.2d 245 (D.C. 1974); *Harper v. United States*, 811 A.2d 808 (D.C. 2002); *Williamson v. United States*, 445 A.2d 975 (D.C. 1982).

There are instances where an object's dangerous nature is self-evident. *See Savage-El*, 902 A.2d at 122-23 (affirming appellant's conviction for carrying a dangerous weapon for a spray bottle filled with gasoline even though there was no evidence that appellant harmed anyone). However, "[w]hen an object is not dangerous *per se*[,] . . . the trier of fact must consider whether that object is known to be likely to produce death or great bodily injury in the manner it is used[] or threatened to be used." *Stroman v. United States*, 878 A.2d 1241, 1245 (D.C. 2005) (internal quotation marks omitted) (quoting *Arthur v. United States*, 602 A.2d 174, 177 (D.C. 1992)). To determine whether an ordinary object is dangerous "[t]he injury inflicted by an object is [an] important factor, often a decisive factor[.]"[4] *Id.*

---

[4] This principle is reflected in the cases the government cites. *See Rivera*, 941 A.2d at 441 (concluding that a belt was a dangerous weapon because the officer sustained "a red bruise in the shape of a belt buckle on [his] right upper arm." (alteration in original)); *D.T.*, 977 A.2d at 349, 354, 355 (concluding that "human teeth *may*, as a matter of law, be a 'deadly or dangerous weapon'" if they are "likely to cause death or great bodily injury in the manner in which [a defendant] used them, threatened to use them or intended to use them"; however the injury in this case was insufficient to classify teeth as a dangerous weapon (emphasis added) (quoting D.C.

(quoting *Arthur*, 602 A.2d at 178); *see also Wynn v. United States*, 538 A.2d 1139, 1144 n.14 (D.C. 1988) ("[T]he best evidence of a weapon's dangerous character is the injury *actually* inflicted by it." (emphasis added) (citing *Freeman v. United States*, 391 A.2d 239, 242 (D.C. 1978))). In fact, when this court reversed the trial court's finding that the flip flop in *Stroman* was a dangerous weapon, we did so after analyzing the injury the victim sustained. *Id.* at 1246 ("Even assuming that a rubber soled flip flop could inflict great bodily injury, there is no evidence that the victim in this case, in fact, suffered great bodily injury.").

An umbrella's dangerous character is not self-evident. This case is somewhat similar to *Stroman* in that we lack evidence that Ms. Jones's injuries were caused by the umbrella. *See Stroman*, 878 A.2d at 1246. Moreover, here, we lack almost any evidence beyond testimony that Ms. Jones was struck with the umbrella. Although

---

Code § 22-405(b))); *Harper*, 811 A.2d at 810-11 (reversing an attempted PPW conviction because "the record lack[ed] evidence" establishing that a "'little' plastic flowerpot could have produced 'death or great bodily injury'" since no one was injured (quoting D.C. Code § 22-4514)); *Williamson*, 445 A.2d at 977, 979-80 (concluding that the jury could rely on "familiar and common experience" to find that an umbrella *with a copper pipe attached* was a dangerous weapon that bruised the victim's arm (quoting *Parker v. United States*, 359 F.2d 1009, 1013 (D.C. Cir. 1966))).

Additionally, the government's reliance on *Brooks* is unpersuasive because this court held that the trial court erred by failing to allow the jury to consider whether a wooden table leg could constitute a dangerous weapon. *Brooks*, 330 A.2d at 246-47.

Exhibit B shows that the umbrella rod broke off to a pointed end where the handle separated, the main body remained cloth-covered without any exposed metal or plastic that could be expected to cause serious injury. Moreover, there is no way for us to know whether the handle broke off when the umbrella hit the car, when it hit Ms. Jones, or at any other point in the chaos. Aside from Ms. Carrington's vague statement about "breaking it up," *see supra* at n.1, which we take to mean Ms. Carrington got her umbrella out to break up the fight, there is no evidence that even alludes to the umbrella being broken to render it more readily dangerous. We also lack evidence as to which side of the umbrella was used to hit Ms. Jones.

Ms. Brown demonstrated only how Ms. Carrington used the umbrella against Ms. Brown's vehicle. Ms. Brown showed that Ms. Carrington held the umbrella with "both hands over her head and swung [it] at a rapid pace downward" to strike the windshield of the unoccupied Jeep "[s]everal" times. If swung with similar strength and speed, particularly if the blunt solid handle were still attached, it could certainly injure a human. In Exhibit 6A, bruising is seen on Ms. Jones's face on her cheek, away from particularly vulnerable locations such as her eyes. However, absent evidence that Ms. Jones's bruising came from being attacked with the umbrella and not the initial altercation, how Ms. Carrington struck Ms. Jones, the condition of the umbrella at the time of attack, and any relevant detail beyond the fact that Ms. Jones was struck, we are left without evidence to allow us to conclude

that, in this situation, the umbrella constituted a dangerous weapon.[5]  Therefore, we reverse Ms. Carrington's conviction for attempted PPW.

### IV.  Conclusion

For the foregoing reasons, the judgment of the Superior Court is affirmed in part and reversed in part, with Ms. Carrington's conviction for attempted PPW for unlawful use being vacated.

*So ordered.*

---

[5] Other jurisdictions have concluded that an umbrella can be a dangerous weapon only when there is evidence regarding the injury the umbrella inflicted or the manner in which the defendant used the umbrella to attack the victim. *See, e.g.*, *Peoples v. Dones*, 279 A.D.2d 366, 366 (N.Y. App. Div. 2001) (upholding an attempted assault conviction because "the evidence warranted the conclusion that defendant used an umbrella in a manner that rendered it a dangerous instrument"); *State v. Andrews*, 665 So. 2d 454, 455-57 (La. Ct. App. 1995) (affirming convictions for armed robbery and attempted second degree murder because one of the perpetrators used an umbrella "to inflict great bodily harm on the victim[,]" which included "pierc[ing] the victim's arm."); *People v. Nosea*, 212 A.D.3d 511, 511-12 (N.Y. App. Div. 2023), *leave to appeal denied*, 39 N.Y.3d 1143 (N.Y. 2023) (affirming an assault in the second degree conviction after concluding that an umbrella constitutes a "dangerous instrument" given the physical injuries the victim sustained after he was "beat . . . over the head with an umbrella").